THE STATE *ex inf.* CROW, *Attorney-General,* v. WEST SIDE STREET RAILWAY COMPANY.

In Banc, November 16, 1898.

1. **Laws:** UNCERTAINTY. A statute can not be held void for uncertainty, if any reasonable and practical construction can be given to its language.

2. ———: ———: RULE OF ACTION. An act of the legislature, to be enforcible as a law, must prescribe a rule of action, and such rule must be intelligibly expressed. If no judicial certainty can be settled upon as to its meaning, the statute is void.

3. ———: ———: JUDICIAL LEGISLATION. The courts can not supply omissions or remedy defects in a legislative act.

4. ———: ———: SALE OF FRANCHISES: JULIAN LAW. The act of April 9, 1895, entitled "An act to secure to each county, city, village and other municipal or public corporation adequate compensation for the occupation or use of its streets or other public lands by private companies, copartnerships, corporations or individuals," is held to be void for uncertainty, and because it is not susceptible of any construction that will enable the courts to carry out its provisions.

*Quo Warranto.*

WRIT OF OUSTER DENIED.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for informant.

(1) A street railway constructed and operated without authority of law is a public nuisance. *Larimer and Lincoln v. Railroad*, 137 Pa. St. 533; Booth on Street Railway, sec. 3; *Fanning v. Osborne*, 102 N. Y. 441. (2) The appropriate remedy for the unauthorized use of streets for railway purposes, in so far as the city is concerned, is a proceeding by *quo warranto* on the information of its duly authorized public officer. *State ex rel. v. Railroad*, 140 Mo. 539. (3) The general rule is that where there has been a misuse or non-user by the corporation of its franchise, under such circumstances, the sovereign who granted the charter may insist on resuming the grant by a proceeding of *quo warranto*. *State v. Railroad*, 37 Mo. App. 496; *Com v. Bank*, 38 Pa. 389; *Atty-Gen.v. Petersburg*, 6 Ired. 456; *People v. Railroad*, 126 N. Y. 29; *State ex rel. v. Railroad*, 140 Mo. 539. (4) Except as restrained by the Constitution, the legislative power over street railway franchises is untrammeled and supreme. Mills

on Em. Dom., secs. 201 and 203; *State v. Hoboken*, 35 N. J. Law, 205; Booth on Street Railways, sec. 12; *Railroad v. Railroad*, 10 Wall. 38; *Coleman v. Railroad*, 38 N. Y. 261; *Brooklyn & Newton v. Railroad*, 35 Barb. 464; *Railroad v. Memphis*, 4 Cold. 406; *State v. Railroad*, 10 So. Rep. 590. (5) The act can be practically enforced according to its terms. The title of the act is: "An act to procure adequate compensation for the occupation or use of streets or public lands." "Land" here means just what it says, "land" as commonly known and called. The title of the act makes distinction between property in the city and streets or other public land, and also between streets and other public places, which public places might consist of parks or public squares, or country roads, or ground owned by a county or city upon which an electric light plant, a reservoir, or standpipe for water might be erected, or through which a street railroad might run, and the value of such land so occupied and used could be ascertained. Therefore, where the act says that the percentage shall be increased in proportion to the increase in value of the land thus occupied and used, it means land other than and distinguished from the street. Our conclusion, therefore, is that there will be no increase of the percentage after the first five years for the use of the streets, but where the street railway occupies other land of the city, village, town or county than the streets, the percentage must increase to correspond to and embrace the increase of the fair rental value of said land. Endlich on Stat. Interp., sec. 27. The mischief the law was intended to meet was the giving away of valuable public franchises. The remedy the legislature provided was for the sale of the same. The reason of the public sale being provided, the remedy was that the

competition might be free and open. (6) Grant of power to sell franchises gives implied power to city to carry out by proper means the power granted. *Railroad v. Marion County*, 36 Mo. 295; 47 N. E. Rep. 277.

*F. N. Judson*, also, for informant.

(1) Neither Kansas City nor St. Louis is exempted from this legislation, enacted in the exercise of the police power of the State, nor are there any decisions of this court sustaining such exemption. *St. Louis v. Murnane*, 123 Mo. 479; *Kansas City ex rel. v. Scarritt*, 127 Mo. 642; *St. Louis v. Dorr*, 145 Mo. 466; *Ewing v. Hoblitzelle*, 85 Mo. 64; *Thomas v. Ashworth*, 73 Cal. 73; *State ex rel. v. Sup. Court*, 14 Wash. 604; *Ferrenback v. Turner*, 86 Mo. 419; *Glaessner v. Brewing Ass'n*, 100 Mo. 508; *State ex rel v. Railroad*, 117 Mo. 1. (2) The subject-matter of the act is in no sense a matter of strictly municipal regulation. 1 Dillon's Mun. Corp., sec. 21; *Beekman v. Railroad*, 47 N. E. Rep., 277; *State ex rel. v. Murphy*, 134 Mo. 548; *People v. O'Brien*, 111 N. Y. 1. (3) The act is not in conflict with section 20 of article XII of the Constitution. This provision is not restriction upon legislative power, except as therein provided. Booth on Street Railroads, 13 to 15; 2 Dillon on Mun. Corp. [4 Ed.] 860; Redfield on Railways [3 Ed.] 317; *State ex rel. v. Railroad*, 140 Mo. 539; *Beekman v. Railroad*, 153 N. Y. 144. (4) The provisions of the law are practicable and enforcible. Black on Interp. of Laws, sec. 49. The word "land" is to be construed as the franchise for the use of the land. 12 Am. and Eng. Ency. of Law, p. 655; *St. Louis v. Tel. Co.*, 149 U. S. 465; R. S. 1889, sec. 1186; *Railroad v. Railroad*, 105 Mo. 562. (5) It is immaterial that the act may be

State ex inf. v. Street R'y Co.

inapplicable or unenforcible without amendment as to some of the other franchises included within its scope. Such a defense can not be made by the defendant, who is confessedly within its scope.   Cooley on Cons. Lim. [2 Ed.] 180; *Grimes v. Eddy*, 126 Mo. 180; *State ex rel. v. Field*, 119 Mo. 612; *Railroad v. Evans*, 85 Mo. 307; *State v. Bockstruck*, 136 Mo. 353.

*H. S. Julian*, also, for informant.

(1) A municipal corporation can not grant a franchise to operate a street railway, because it is a sovereign power and resides in the State legislature.  *Railroad v. Railroad*, 10 Wall, 51; *Davis v. Mayor*, 14 N. Y. 514; *Milham v. Sharp*, 27 N. Y. 611; *State v. Cincinnati Gas Co.*, 18 Ohio St. 262.   (2) New York, Illinois and Pennsylvania have similar constitutional provisions to section 20, article XII of Missouri's Constitution, and the courts of those States have upheld the constitutionality of statutes passed in pursuance to them, regulating and directing how the consent of cities could be given for the use and sale of State franchises to be used in the streets of municipalities. *Mayor v. Railroad*, 113 N. Y. 311; *People v. Sharp*, 45 Hun. 461; *People v. Barnard*, 110 N. Y. 548; *In re Railroad*, 102 N. Y. 347; *Beekman v. Railroad*, 153 N. Y. 144; *Byrne v. Railroad*, 169 Ill. 75; *Alleghany v. Railroad*, 159 Pa. St. 415.

*Karnes, Holmes & Krauthoff* and *Frank Hagerman* for respondent.

(1)   The grant of the right to use the streets for street railways is by section 20 of article XII of the Constitution "a matter of strictly local interest." *Railroad v. Detroit*, 64 Fed. Rep. 628; *Railroad v. Railroad*, 56 Fed. Rep. 746; *Railroad v. Railroad*, 127 Ind.

369; *Kenneley v. Jersey City*, 57 N. J. Law, 293.
(2) The grant of power thus made by the Constitution
to the local authorities can not be taken away or im-
paired by a statutory enactment. *St. Louis v. Von
Phul*, 133 Mo. 561; *Ex parte Smith*, 135 Mo. 223.
(3) The case involves a question of power. It depends
upon the nature and extent of the power vested in the
local authorities by section 20 of article XII of our
Constitution. *Railroad v. St. Louis*, 3 Mo. App. 315;
*Fath v. Railroad*, 105 Mo. 537; *Railroad v. Railroad*,
105 Mo. 162. (4) The power to consent, to contract on
the subject, to grant the needed *quasi* franchise, hav-
ing been conferred on the local authorities in general
terms, the power, under an established rule "is to be
construed as co-extensive with the terms, unless some
clear restriction upon it is deducible from the context."
Story, Const., sec. 424; Cool. Const. Lim. [6 Ed.]
78; *State v. Laclede Gaslight Co.*, 102 Mo. 472; *Hag-
erty v. St. Louis Ice Co.*, 143 Mo. 238; *Page v. Allen*,
58 Pa. St. 338; *Bridgeport v. Railroad*, 15 Conn. 475.
(5) This so-called "Julian Law" is void as to all
cities in the State, not only because of its conflict with
section 20 of article XII of the Constitution, as
already shown, but also because it is so inartificially
constructed as to be an abortive and ineffectual attempt
at an expression of legislative will. *Drake v. Drake*, 4
Dev. 110. *State v. Partlow*, 91 N. C. 550; *Ward v.
Ward*, 37 Tex. 389; *Comm. v. Bank*, 3 Watts & Serg.
173.

*G. A. Finkelnburg*, also, against the validity of the
"Julian Law."

(1) Whatever may be the ultimate determina-
tion as to the general validity of the "Julian Law," it

seems clear that it can not operate upon *bona fide* extensions of the routes of existing street railways. *People v. Davenport*, 91 N. Y. 579; *U. S. v. Kirby*, 7 Wall. 482; Sutherland on Const. of Stat., sec. 346; *Fusz v. Spaunhorst*, 67 Mo. 256. A legislature will not be presumed to have intended that which is against reason. 23 Am. and Eng. Ency. of Law, 358; *Potter v. Douglas Co.*, 87 Mo. 239. (2) It is not apparent how an extension of the wire system of an existing telephone company can be sold at public vendue; such an extension can not be operated independently, it must of necessity be operated in connection with the switchboard of the central station; and so an extended net of waterpipes must always be connected with the reservoir, and an extended net of gas pipes must of necessity be connected with the gasholder. Sutherland on Const. of Stat., sec. 323; Black on Interp. of Law, 104; *Mayor v. Weems*, 5 Ind. 547. Now although the word "extension" appears in the text of the Julian Law that word may be given proper effect by applying it to an extension of time and not to a physical extension of a railway or gas or water plant. In this way the word "extension" will receive a reasonable, sensible and practical interpretation and will be made operative in an important respect whenever a franchise is about to expire by limitation of time, or whenever application is made for a prolongation or renewal of a franchise, which is a matter of common and frequent occurrence. (3) The general object of the Julian Law was to regulate the granting of new and independent franchises. This is obvious from the general context of the law, the impracticability of any other construction, and from the use of the word "plant" in various places in the text. 18 Am. and Eng. Ency. of Law, 465. (4) The law was not intended to apply to

any case in which *bona fide* competition would be impossible.  *People ex rel. v. Craycroft*, 111 Cal. 544.

*John H. Overall* and *Henry Hitchcock, amici curae.*

(1)  The act of April 9, 1895, is invalid, because incapable of enforcement and as not affording a rule of action.   This act is a conglomerate piece of patchwork seemingly taken from laws of several states, and, as usual in such cases, is lacking in unity and requires further legislation for its enforcement which the courts are not authorized to supply.   It seems to have been taken for the most part from the statute of California, approved March 23, 1893, and from the various laws of New York.   (2)  If it is intended by the act that the aggregate minimum amount to be paid to all such counties, cities, towns and villages shall be paid to them collectively, then the law is invalid, because it is incapable of being enforced, no provision having been made for the distribution of such percentage, or ascertainment of the amount to be received by each municipality respectively.   (3)  If it is intended by the act that two per cent of such gross earnings shall be paid to each of the municipalities, a more serious objection arises.   The Wabash Railroad is constructed through seventeen counties and forty-nine cities, towns and villages in this State, making in all sixty-six municipal and *quasi*-municipal corporations, to each of which, if it was about to construct its road, it would have to give each year two per cent of its gross earnings, making in all one hundred and thirty-two per cent of its gross earnings; that is, all of its gross earnings each year, and in addition, out of its capital, a sum equal to thirty two per cent of its gross earnings.   (4)  No provision is made for the manner in which, or the tribunal by whom, is to be determined the gross receipts from "the

occupation and use of the public lands and streets," as distinguished from the gross receipts from the occupation and use of the lands and property of the company held in its own right. (5) No provision is made for the manner by which, or the person by whom, is to be ascertained the "increase in the value of the land thus occupied and used."

*R. B. Middlebrook, S. S. Winn* and *Clarence S. Palmer* for Kansas City.

(1) The right to use the public streets is under the control of the local authorities. Constitution, sec. 20, art .XII. (2) The State can grant to local municipal bodies the right to grant franchises to use streets. Elliott on Railroads, sec. 1077; *Indianapolis v. Railroad,* 127 Ind. 369; *Railroad v. Railroad,* 31 Kan. 660; *Railroad v. Detroit,* 64 Fed. Rep. 628; *Brown v. Dupleissee,* 14 La. Ann. 842; *Michigan City v. Boecking,* 122 Ind. 39. (3) Land can not be taken for the purpose of reselling or renting to secure revenue. *In re Albany Street,* 11 Wend. 151; *Embry v. Connor,* 3 N. Y. 511; *Buckingham v. Smith,* 10 Ohio, 288. (4) The question of revenue to the city from use of its streets being purely local, the legislature can not in this respect amend the charter of Kansas City. Sec. 16, art. IX, Constitution; *State ex rel. v. Field,* 99 Mo. 352; *Westport v. Kansas City,* 103 Mo. 141; *Kansas City ex rel. v. Scarritt,* 127 Mo. 642; *Kansas City v. Ward,* 134 Mo. 172; *Kansas City v. Marsh Oil Co.,* 140 Mo. 458.

*Edward C. Crow,* Attorney-General, *Sam B. Jeffries,* Assistant Attorney-General, and *F. N. Judson* for informant in reply.

(1) For the purpose of this case it is wholly irrelevant whether that provision for an increase of the

earnings is capable of an enforcement or not. (2) The grant of the power to the municipality carries with it the power to make the necessary provisions for determining the increased value of the occupation and use under the principle laid down by this court in *Railroad v. Railroad*, 105 Mo. 562. A condition to that effect could readily be imposed in the terms of the public letting. (3) Conceding that there is an ambiguity in this provision, it will present a proper case for judicial construction when occasion arises. It is only when there are ambiguities in statutes that there is occasion for judicial construction. Endlich on Interp. of Stat., sec. 4; *Plum v. City of Kansas*, 101 Mo. 525; *St. Louis v. Lane*, 110 Mo. 254.

WILLIAMS, J.—The Attorney-General has presented to this court an information, charging that the repondent is unlawfully usurping the franchise of being a body corporate and politic, under the name of the "West Side Street Railway Company;" and, without legal warrant therefor, is operating and conducting an electric street railway over and along certain streets in Kansas City, and carrying passengers thereon for hire. A judgment of ouster is prayed.

The respondent, being called upon to show by what authority it is claiming, using and exercising the rights and privileges above recited, filed an answer, setting out in detail the various steps leading up to its incorporation under Article VIII, Chapter 42, of the Revised Statutes of this State, and, as its warrant for constructing and operating said street railway, pleading an ordinance of Kansas City, adopted October 5, 1896, granting it authority so to do.

The Attorney-General demurs to this answer, on the ground that it does not allege that the ordinance relied upon by respondent was enacted in conformity

with the act of the General Assembly, approved April 9, 1895, entitled "An Act to secure to each county, city, village and other municipal or public corporation adequate compensation for the occupation or use of its streets or other public lands by private companies, copartnerships, corporations, or individuals;" and because it does not appear from said answer, that said franchise was granted in the manner required by the above mentioned act.

The first section of the act (Acts 1895, p. 53) referred to is as follows:

"*Section 1.*  The public authorities of every county, city, village or other municipal or public corporation, to whom application may be made by any private company, copartnership, corporation, individual on individuals for consent to the construction, extension, maintenance, occupation or use of any electric lighting plant, or plant for generating, transmission, sale, or use of electricity, gas lighting plant, street railway, or railroad for the transportation of either freight, passenger, or mails, telephone or telegraph plant, or plant for supplying water, above, across, along, beneath or through any highway, road, avenue, alley, park, square, street or other public lands, must provide, as a condition precedent to the granting of such consent, that the franchise, privilege and right of such occupation and use of any such public places for any such private purposes, shall be sold at public auction to the responsible bidder who will give the largest percentage yearly of the gross receipts derived from such occupation and use, with adequate security, as hereinafter provided, for the payment thereof and for the prompt construction and completion of the proposed plant; *provided* that such payment shall in no case be less than two per cent of the gross earnings during the first five years of such

occupation and use and thereafter, for each period of five years, such percentage shall be increased to correspond with the increase in value of the land thus occupied and used.''

The respondent makes no claim that the procedure pointed out in the section just quoted was pursued by the city authorities, or that the franchise conferred upon it was offered at public auction to the bidder who would pay the largest percentage of the gross receipts as therein required.   Upon the contrary, it is confidently asserted that this act of the legislature is of no force or effect, and that the city was not deprived by it of the power to grant, upon terms satisfactory to itself, the right to construct and operate street railways within its boundaries.

It is not, nor can it be disputed, that Kansas City, under its charter, had full power, unless restrained by the act above copied, to pass the ordinance relied upon in the answer, and to authorize the use of its streets for respondents' electric street railway, and to fix the terms upon which the city would give its consent for this to be done.

The ordinance, in the absence of a valid and controlling statute to the contrary, is an all-sufficient warrant for the exercise by respondent of the franchise referred to in the information, so far at least as the use of the streets is concerned.   In other words, the city had the power under its charter to pass the ordinance empowering respondent to construct and operate its railway in the streets of said city, upon the terms fixed by said ordinance, without first offering that privilege to bidders at public auction, unless such right was taken from it by the Legislature through the act of 1895, *supra*.

Several reasons have been given why this act can not have that effect.

It is argued that it is too vague, indefinite and uncertain in its provisions to be capable of practical construction and enforcement, and hence is an abortive and ineffectual attempt to express the legislative will.

It is also claimed that section 20 of article XII of the Constitution, which prohibits the General Assembly from passing any law granting the right to construct and operate a street railroad within any city, without first acquiring the consent of the local authorities thereof, so far withdraws from the Legislature the power of the State to deal with street railway franchises, and vests the same in the cities concerned, as to enable said cities to make such contracts as they desire, as conditions of granting such consent; and that the act of 1895 impairs this constitutional right.

The further contention is, that the people of the State, by constitutional provision, conferred upon Kansas City the power to frame and adopt by popular vote a charter for the government of said city in matters pertaining exclusively to its municipal affairs, and that the construction and operation of street railways within the limits of said city are, under said constitutional grant, properly regulated by said charter and its ordinances made pursuant to it, and not by the legislative act in question.

These propositions have been ably argued orally at the bar by counsel for the respective parties, and elaborately discussed in numerous briefs filed herein.

If any one of the objections raised to the act is well taken, it can not stand and the demurrer of the Attorney-General must be overruled.

Recurring to the point first suggested, this question is presented: Does the act sufficiently express the legislative will to enable the courts and officers charged with its execution to ascertain and enforce it?

A statute can not be held void for uncertainty, if

any reasonable and practical construction can be given to its language. Mere difficulty in ascertaining its meaning or the fact that it is susceptible of different interpretations will not render it nugatory. Doubts as to its proper construction will not justify us in disregarding it. It is the bounden duty of the courts to endeavor by every rule of construction to ascertain the meaning of, and to give full force and effect to every enactment of the General Assembly not obnoxious to constitutional prohibitions.

It is equally true that a mere collection of words can not constitute a law; otherwise the dictionary can be transformed into a statute by the proper legislative formula. An act of the legislature, to be enforcible as a law, must prescribe a rule of action, and such rule must be intelligibly expressed.

"It is plainly the duty of the court to so construe a statute, ambiguous in its meaning, as to give effect to the legislative intent, if this be practicable. . . . . . . But a statute must be capable of construction and interpretation; otherwise it will be inoperative and void. The court must use every authorized means to ascertain and give it an intelligible meaning; but, if after such effort it is found to be impossible to solve the doubt and dissolve the obscurity, if no judicial certainty can be settled upon as to the meaning, the court is not at liberty to supply, to make one. The court may not allow 'conjectural interpretation to usurp the place of judicial exposition.' There must be a competent and efficient expression of the legislative will." *State v. Partlow*, 91 N. C. *loc. cit.* 552.

In *Drake v. Drake*, 4 Dev. *loc. cit.* 115, Chief Justice RUFFIN said: "Whether a statute be a public or a private one, if the terms in which it is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is

necessarily inoperative.   The law must remain as it
was, unless that which professes to change it, be itself
intelligible."

In *Ward v. Ward*, 37 Tex. *loc. cit.* 392, the court de-
clared: "We hesitate, to consider well any judgment of
ours, which declares unconstitutional or void an act of
the legislature, paying due deference to the learning and
wisdom of that branch of the government.   But when
we find ourselves totally unable to administer a law by
reason of its uncertainty or ambiguity, or believe it to
be unconstitutional, we shall not hesitate to discharge
the duty which the law devolves upon us.   We do not
mean to say, by any means, that the act of November
1st, 1871, is unconstitutional, but we do say that it is
nugatory and void for want of some adequate provision
in the law to carry out its execution."   See, also, *Com-
monwealth v. Bank of Pennsylvania*, 3 Watts & Serg.
173; Sutherland on Statutory Construction, secs. 261
and 431.

It is needless to cite authorities to show that which
is self-evident.   It is manifest that an act of the legis-
lative department can not be enforced, when its meaning
can not be determined by any known rules of con-
struction.

The courts can not venture upon the dangerous path
of judicial legislation to supply omissions, or remedy
defects in matters committed to a co-ordinate branch of
the government.   It is far better to wait for necessary
corrections by those authorized to make them, or, in
fact, for them to remain unmade, however desirable
they may be, than for judicial tribunals to transcend
the just limits of their constitutional powers.

Turning then to the act of April 9, 1895, upon
which the Attorney-General bases his case, it will be
observed that an attempt is made to regulate by one
general provision the method of granting franchises of

many different kinds. The privilege of constructing railroads, street railways, electric light plants, gas works, waterworks, telegraph and telephone lines and extensions thereof "above, across, along, beneath or through any highway, road, avenue, alley, park, square, street or other public land," the act declares, must be "sold at public auction to the responsible bidder, who will give the largest percentage yearly of the gross receipts derived from such use and occupation."

The provision is made equally applicable to each privilege or franchise mentioned. They are all placed upon the same footing and, under the act, must be disposed of in the same way. The Legislature evidently intended to make no discrimination.

It will be seen at a glance that it is utterly impossible to give this act any reasonable or sensible construction as applied to railroads. If it means that the company must pay at least two per cent of its entire gross earnings for the first five years (to be subsequently increased) to each municipality, over whose streets it may be built, and to each county, whose highways it may cross, the railway company, in many instances, will be compelled to pay more than its total receipts for the right to build its road over the highways and through the cities along its way.

If, as some of the counsel suggest, the percentage should be computed only upon the gross receipts of that part of the road located upon the streets of the city, or across the highways, as the case may be, then we are met by the fact that there is no method provided (if it is possible to suggest one), by which the *actual* gross receipts of *that particular part* of the road can be ascertained. Such receipts will not necessarily be in the same proportion to the entire earnings as the length of the road upon the highways or streets may be to the entire length of such railroad.

Travel may be greater or less upon one part of the road than upon another. Such a rule would be an arbitrary one, which the *act* has not prescribed, and which will not comply with *its* terms.

Aside from these considerations, a continuous line of railroad can not be subdivided so as to permit competition for the privilege of constructing and operating *separately* the *portions* thereof *lying within the municipalities* and *across the highways* upon its route. It can not have been intended that, when a railroad is built to the boundaries of a city or to the limits of a public highway on its line, the right to construct such railroad through the city or across the highway over which it must pass, must be "let at public auction to the responsible bidder who will give the largest percentage yearly of the gross receipts derived from the use and occupation" of such streets and highways. There can not be any competition, in the very nature of the case, for the privilege of constructing and operating that *part* of a continuous line of railroad located within the limits of the highways or streets, as distinct from the entire road, which may extend over many miles.

Much that has been said applies with equal force to "*extensions*" of street railways, telegraph and telephone lines, gas works, waterworks, etc., referred to in said act. An "*extension*" becomes part of the existing plant and forms a continuation thereof. The pipes in an extension of a system of waterworks, must connect with the reservoir, gas pipes with the gas-holder, and the wires of a continuous telephone line with the central station. The privilege of making such an "extension" can only be conferred upon the owner of that which is to be extended. If granted to any one else, it must necessarily be an independent enterprise. A city may exact conditions for its benefit before it will consent to the use of its streets for such "extensions,"

or it may withhold its consent altogether.   It may also authorize the building of an independent line or the construction of a new plant.   An "extension," however, to be operated in physical connection with the original and as an integral part of one system, can only be made by the owner thereof.

Then, too, an extension of a street railway gives an increased distance over which people may be carried for a single fare, and the act, as in case of railroads, gives no rule by which to determine the amount of the gross receipts to be credited to the new portion of the line.

It is argued that notwithstanding the act must be held nugatory as to many of the franchises, which it attempts to regulate, yet it can be applied to and enforced against this defendant, which obtained the city's consent to operate therein a *new* street railway.  Without stopping to inquire whether the legislature *intended* to *discriminate* in favor of *existing* companies by permitting *"extensions"* for which in the very nature of the case there can be no competitive bidding, and, at the same time, requiring like privileges, if applied for by others, to be let at public auction to the bidder offering the largest percentage of the gross receipts, we find insuperable obstacles in the way of any attempt to practically enforce the act.

It provides that the right to use the public highways for street railroads "shall be sold at public auction to the responsible bidder who will give the largest percentage yearly of the gross receipts *derived from such use and occupation* . . . . . . *provided* that such payment shall in no case be less than two per cent of the gross earnings during the first five years *of such occupation and use*, and thereafter, for each period of five years, such percentage shall be increased to correspond with

the increase in value of the *land* thus *occupied* and *used."*

Upon what gross earnings is the percentage to be computed? A large capital must be invested in the machinery and appliances for conducting a street railway, aside from the tracts laid in the streets. The act seems to contemplate that the bid shall be a percentage only of the receipts derived from the *use and occupation* of the *public* property. How is the proper proportion of the gross earnings that should be attributed to the capital invested in the power stations, machinery, etc., to be ascertained? Shall. it be, by valuing the entire plant, and deducting therefrom the proper valuation of the machinery and apportioning the gross earnings according to these amounts? If so, how shall this value be fixed and by whom? The act furnishes no answer.

Again, the percentage is to be increased in "each" period of five years" "to correspond with the increase in the value of the land thus occupied and used."

But the act gives no intimatian by whom or in what manner this increase is to be settled and determined.

There is painful obscurity too as to what is meant by the "increase in the value of the *land thus occupied and used."*

Some of the counsel for the State say that the proviso should be rejected *in toto,* as inapplicable to street railways where the *streets* only are so occupied. The act, however, declares that the same rule shall govern the disposition of all the franchises mentioned therein. It was certainly designed to increase the percentage "as the years go by" where street railways are concerned, fully as much as in other cases. There is nothing to indicate that any special favors are to be accorded them. Then the act has to do almost entirely with franchises which involve the *use of the streets only*

and in which simply that privilege will be asked. If the requirement for an increased payment for the franchise, after five years, is meaningless in *those* cases, the proviso is practically eliminated. No one can say that the legislature would have passed the act with the feature, increasing the percentage in each term of five years, omitted. It forms a most material and important part of the plan contained therein.

Counsel say that instances *may* arise wherein a street railway company, in addition to the occupation of the streets with its tracks, may also desire for some of its purposes the possession of *land* belonging to the municipality, and there the proviso can be made effective. This construction would bring up an additional difficulty. There is no possible method by which the gross receipts derived from the use and occupation of the *lot of ground* can be ascertained, and the act makes no provision for doing so.

Other counsel for the State contend that "land," as here used, refers to the franchise granted, and that the per cent of gross earnings to be paid for the same, under this proviso, must be increased every five years, in proportion to the increase in the value of said *franchise*, as shown by the gross receipts derived therefrom. It is argued upon the other hand that this can not have been the intention, for the city, at the original per cent, will receive its due share of any increase in the earnings. Counsel upon the same side of the controversy have been unable to agree as to the proper construction to be adopted.

It will be thus seen that it can not be stated with *any* degree of certainty *what* meaning should be ascribed to this part of the act. No bidder can know what he will have to pay under it. No municipal officer, when called upon to accept or reject a bid, can say what the city will receive by virtue of it.

It will be also noticed that the increase in the percentage is to be made for each period of five years in proportion to the increase in the value of the land. Between what years shall the comparison be made? Must it be the *last* year of the first period with the *first* year of the next; or the *first* year of the first term with the *last* year of that which follows? Or shall no rent be paid until the average valuation of one period of five years can be compared with the average of another, and in that way the ratio of increase be reached? Who shall say what years shall be selected for the purpose of comparison? The act gives us no data upon which to predicate a reply to these questions.

These are matters which are not provided for therein, and without which the act can not be carried into practical effect. The courts can not aid the "defective phrasing of an act; we can not add and mend, and by construction make up deficiencies which are left there."

This attempt at legislation is so indefinite and uncertain, by reason of the effort to regulate the disposition of a great number of franchises by one general rule, that we must hold it incapable of practical operation and enforcement. Its provisions are so obscure that it is impossible to ascertain and declare their proper meaning. "If the terms in which 'a statute' is couched be so vague as to convey no definite meaning to those whose duty it is to execute it ministerially or judicially, it is necessarily inoperative."

Entertaining these views we find it unnecessary to consider the other questions discussed by counsel.

The return is adjudged sufficient in law and judgment entered for respondent. GANTT, C. J., SHERWOOD, BURGESS, ROBINSON and BRACE, JJ., concur. MARSHALL, J., having, while city counselor of St. Louis,

given an opinion concerning the validity of the act under consideration, declined to sit in the case and takes no part in the decision.