## UNITED STATES v. SPOKANE DRY GOODS CO. SAME v. HILL BROS. SHOE CO. SAME v. CULBERTSON—GROTE—RANKIN CO.

(District Court, E. D. Washington, N. D.   March 13, 1920.)

Nos. 3364–3366.

**1. War ⊜⇒4—Indictment for exacting unreasonable profit sufficient, though date of acquisition of goods not stated.**

An indictment charging that a dealer violated the Food Control and District of Columbia· Rents Act by charging $45 for a woman's cloak, the cost price of which was $21.98, is sufficiently definite, without averring when the dealer purchased the garment, where it was specifically alleged that the selling price was unreasonable, unfair, and excessive.

**2. Constitutional law ⊜⇒45—District Court should not declare Food Control and District of Columbia Rents Act invalid, as exceeding war powers.**

In view of the necessarily far-reaching effects such a decision would have, the District Court should not declare the Food Control and District of Columbia Rents Act invalid, as exceeding the war powers of Congress, on the theory that the war power of the federal government under the Fifth Amendment is only commensurate with the police power of the states under the Fourteenth Amendment.

**3. Criminal law ⊜⇒13—Act making exaction of unreasonable profits in necessaries an offense held valid.**

The Food Control and District of Columbia Rents Act, enacted by Congress under its war powers, which denounced the demanding of exorbitant profits by dealers in necessaries, is not, in view of the decisions of the federal Supreme Court to the effect that the Anti-Trust Acts are directed against an unreasonable monopoly, invalid on the theory that the offense was not sufficiently defined.

The Spokane Dry Goods Company, the Hill Bros. Shoe Company, and the Culbertson-Grote-Rankin Company, each a corporation, were separately indicted for violation of the Food Control and the District of Columbia Rents Act of October 22, 1919. On demurrers to the indictment. Demurrers overruled.

Francis A. Garrecht, U. S. Atty., and Charles H. Leavy, Asst. U. S. Atty., both of Spokane, Wash.

Danson, Williams & Danson, of Spokane, Wash., for defendant. Spokane Dry Goods Co.

Graves, Kizer & Graves, of Spokane, Wash., for defendant Hill Bros. Shoe Co.

Wakefield & Witherspoon and Turner, Nuzum & Nuzum, all of Spokane, Wash., for defendant Culbertson-Grote-Rankin Co.

RUDKIN, District Judge. The indictments in these cases were returned under the act of Congress of October 22, 1919, known as the "Food Control and the District of Columbia Rents Act." 41 Stat. 297, c. 80. The first section recites:

"That by reason of the existence of a state of war, it is essential to the national security and defense, for the successful prosecution of the war and for the support and maintenance of the army and navy, to assure an adequate supply and equitable distribution, and to facilitate the movement of foods, feeds, wearing apparel, containers primarily designed or intended for containing foods, feeds, or fertilizers, fuel, including fuel oil and natural gas, and fer-

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
264 F.—14

tilizer and fertilizer ingredients, tools, utensils, implements, machinery, and equipment required for the actual production of foods, feeds, and fuel, hereafter in this act called necessaries; to prevent, locally or generally, scarcity, monopolization, hoarding, injurious speculation, manipulation, and private controls affecting such supply, distribution, and movements; and to establish and maintain gōvernmental control of such necessaries during the war. For such purposes the instrumentalities, means, methods, powers, àuthorities, duties, obligations, and prohibitions hereinafter set forth are created, established, conferred, and prescribed. The President is authorized to make such regulations and to issue such orders as are essential effectively to carry out the provisions of this act."

By section 2 it is made unlawful, among other things, for any person "to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries."

The three indictments contain upwards of 200 counts, but so far as material to our present inquiry all counts are the same, and are open to the same objections, if any. The first count of the indictment in case No. 3364 charges that the defendant did—

"knowingly, willfully and unlawfully make an unjust and unreasonable rate and charge in the handling and dealing in and with certain necessary articles. of wearing apparel, to wit, one certain ladies' coat, which said ladies' coat had theretofore been procured by said defendant at a cost to defendant of the sum of twenty-one and $98/100$ dollars ($21.98), and which said ladies' coat, upon the date aforesaid, the said defendant did then and there sell and dispose of at a certain sale shown by defendant's 'The Crescent' sale slip, to wit, name, R. C. Dahlhjelm, bearing No. 12351 and No. 7, to a certain purchaser, a person to the grand jurors unknown, at the price and for the sum of forty-five dollars ($45.00); said selling price, rate and charge of forty-five dollars ($45.00) being then and there an unreasonable, unfair, and excessive price, the addition of twenty-three and $02/100$ dollars ($23.02) to the sum of twenty-one and $98/100$ dollars ($21.98), the cost to defendant of said ladies' coat, being an undue, exorbitant, immoderate, excessive, and monstrous profit, and the said sum and price of forty-five dollars ($45.00) so extorted, exacted and required from said purchaser for said ladies' coat being an unfair, unjust and unreasonable rate and charge in the handling and dealing in and with said necessary article of wearing apparel."

Demurrers have been interposed to the several counts of the indictments on the ground that they fail to state facts sufficient to constitute offenses against the United States. The objections to the indictments are twofold. First, because the act of Congress is invalid; and, second, because the indictments do not charge or allege when the goods were purchased or procured, or that the selling price was in itself unreasonable or unjust. Again, the objections to the act are twofold. The first objection goes to the power of Congress to enact such legislation in any form, while the second is based on the ground that the language of the act defining the crime is too indefinite and uncertain.

[1] 1. Taking up first the objection to the form of the indictments, it is contended that, inasmuch as the date of purchase is not alleged, the mere difference between the purchasing and selling price of an article does not necessarily disclose an unjust or unreasonable charge for handling the same, because the owner is entitled to the full benefit of the increase in the value of his merchandise accruing from natural causes between the date of purchase and the date of sale. This is perhaps true, but the indictments do not stop with the mere averment of

the difference between the purchasing and selling price. It is further charged that the selling price, rate, and charge was an unreasonable, unfair, and excessive price, and this latter averment, coupled with the averment showing the difference between the purchasing and selling price, brings the case clearly within the prohibition of the statute.

[2] 2. The importance of the first objection urged against the Food Control Act cannot be overestimated, as it challenges the power vested by the Constitution in the legislative and executive branches of the government in time of war and public danger. If I understand their position correctly, the contention of counsel for the defendants amounts to this: The war power of the federal government under the Fifth Amendment to the Constitution is only commensurate with the police power of the states under the Fourteenth Amendment, and inasmuch as the states are powerless to regulate prices in cases such as those now before the court under the Fourteenth Amendment the federal government is equally powerless to regulate such prices under the Fifth Amendment, even as a war measure.

It must be conceded that there is great force in this argument, and that it finds support in many adjudications and declarations of the Supreme Court. Thus, in Ex parte Milligan, 4 Wall. 2, 120 (18 L. Ed. 281), the court said:

"Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are now, after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism, but the theory of necessity on which it is based is false; for the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence; as has been happily proved by the result of the great effort to throw off its just authority."

And in the very recent case of Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. ——, decided December 15, 1919, the court said:

"The war power of the United States, like its other powers and like the police power of the states, is subject to applicable constitutional limitations; * * * but the Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon state power."

Again, the court said:

"If the nature and conditions of a restriction upon the use or disposition of property is such that a state could, under the police power, impose it consistently with the Fourteenth Amendment without making compensation, then the United States may for a permitted purpose impose a like restriction consistently with the Fifth Amendment without making compensation; for pro-

hibition of the liquor traffic is conceded to be an appropriate means of increasing our war efficiency."

If the war power of Congress and the President is to be thus limited and restricted, it will be difficult, if not impossible, to sustain much of the war-time legislation of Congress. The acts and regulations fixing the price of coal, of sugar, of wheat and its products, the act taking over control of the railroads, and perhaps numerous other acts and regulations of that period, cannot be justified as mere peace time police regulations. It was suggested on the argument that the act taking over the railroads finds justification in the commerce clause, but this is more than questionable. Doubtless the government might operate the railroads temporarily in some great emergency in time of peace; but the power would pass with the emergency, and an act taking them over for an indefinite period, and fixing arbitrarily the compensation of the owners, finds no justification in the Constitution. Of course it will be said, in response to all this, that the unauthorized exercise of power in one case or in many cases cannot justify the passage of the present act, if violative of the Constitution, and this is no doubt true; but a decision of such far-reaching consequences, involving, as it does or may, the very life and foundation of the government, should come from the court of last resort, and not from this or any other inferior court.

I have thus far assumed that the act cannot be justified as a mere state police regulation, and this is perhaps true. In discussing the right or power of the government to control prices in cases such as those now under consideration, Tiedeman, in his work on Police Power, says:

"It is part of the natural and civil liberty to form business relations, free from the dictation of the state, that a like freedom should be secured and enjoyed in determining the conditions and terms of the contract which constitutes the basis of the business relation or transaction. It is, therefore, the general rule, that a man is free to ask for his wares or his services whatever price he is able to get and others are willing to pay; and no one can compel him to take less, although the price may be so exorbitant as to become extortionate. No one has a natural right to the enjoyment of another's property or services upon the payment of a reasonable compensation; for we have already recognized the right of one man to refuse to have dealings with another on any terms, whatever may be the motive for his refusal. But there are exceptions to the rule which can be justified on constitutional grounds." 1 Tiedeman, State and Federal Control of Persons and Property, § 96.

The exceptions referred to are thus classified by Judge Cooley:

"1. Where the business is one, the following of which is not a matter of right, but is permitted by the state as a matter of privilege or franchise. Under this head may be classed the business of setting up lotteries, of giving shows, and of keeping billiard tables for hire, of selling intoxicating drinks, and of keeping a ferry or toll bridge.

"2. When the state on public grounds renders to the business special assistance by taxation, or under the eminent domain, as is done in the case of railroads.

"3. When for the accommodation of the business special privileges are given in the public streets, or exceptional use allowed of public property or public easements, as in the case of hackmen, draymen, etc.

"4. When exclusive privileges are granted in consideration of some special

return to the public and in order to secure something to the public not otherwise attainable."

Cooley's Principles of Constitution, p. 234.

It has generally been supposed that these exceptions are somewhat enlarged upon by the decision in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, and kindred cases. Thus, in discussing the effect of the decision in that case, Mr. Justice Field in a dissenting opinion said:

"The public is interested in the manufacture of cotton, woolen and silken fabrics, in the construction of machinery, in the printing and publication of books and periodicals, and in the making of utensils of every variety, useful and ornamental; indeed, there is hardly an enterprise or business engaging the attention and labor of any considerable portion of the community, in which the public has not an interest in the sense in which that term is used by the court in its 'opinion; and the doctrine which allows the Legislature to interfere with and regulate the charges which the owners of property thus employed shall make for its use, that is, the rates at which all these different kinds of business shall be carried on, has never before been asserted, so far as I am aware, by any judicial tribunal in the United States."

But without further discussing the rule or the exceptions, for reasons already stated, I am of opinion that the act should not be declared unconstitutional by this court.

[3] 3. This brings us to the last objection urged against the indictments, namely, that the act is void for uncertainty. This view is no doubt sustained by many adjudicated cases not readily distinguishable from the cases at bar. Thus, in Andrew Jackson, Ex parte, 45 Ark. 158, an act making it a misdemeanor to "commit any act injurious to the public health or public morals, or the perversion or obstruction of public justice, or the due administration of the laws," was declared void for uncertainty; the court saying:

"We cannot conceive how a crime can, on any sound principle, be defined in so vague a fashion. Criminality depends, under it, upon the moral idiosyncrasies of the individuals who compose the court and jury. The standard of crime would be ever varying, and the courts would constantly be appealed to as the instruments of moral reform, changing with all fluctuations of moral sentiment. The law is simply null. The Constitution, which forbids ex post facto laws, could not tolerate a law which would make an act a crime, or not, according to the moral sentiment which might happen to prevail with the judge and jury after the act had been committed."

So in C., B. & Q. R. R. Co. v. People, 77 Ill. 444, an act providing that if any railroad company in the state shall charge, collect, demand, or receive more than a fair and reasonable rate or toll or compensation for the transportation of passengers or freight, the same shall be guilty of extortion, was adjudged void for the like reason. A similar ruling was made in Louisville & N. R. Co. v. Commonwealth, 99 Ky. 132, 35 S. W. 129, 33 L. R. A. 209, 59 Am. St. Rep. 457.

In Matthews v. Murphy (Ky.) 63 S. W. 785, 54 L. R. A. 415, an act providing that the state board of health might refuse to issue a certificate to practice medicine to any individual guilty of grossly unprofessional conduct of a character likely to deceive or defraud the public, and might after due notice and hearing revoke the certificate for like cause, was declared void for uncertainty In Hewitt v. State Board of Medical Examiners of the State, 148 Cal. 590, 84 Pac. 39, 3

L. R. A. (N. S.) 896, 113 Am. St. Rep. 315, 7 Ann. Cas 750, a similar ruling was made by the Supreme Court of California.

In Cook v. State, 26 Ind. App. 278, 59 N. E. 489, an act providing that it shall be unlawful for any person to haul over any turnpikes or gravel roads at any time when the same are thawing through, or are by reason of wet weather in condition to be cut up and injured by heavy hauling, a load on a narrow-tired wagon of more than 2,000 pounds, or on a broad-tired wagon of more than 2,500 pounds, was declared void for the same reason.

In Louisville & N. R. Co. v. Railroad Commission of Tennessee (C. C.) 19 Fed. 679, 691, an act forbidding the taking of unjust and unreasonable compensation and the making of unjust and unreasonable discriminations was declared void. A similar ruling was made in Tozer v. United States (C. C.) 52 Fed. 917.

In United States v. Capital Traction Co., 34 App. D. C. 592, 19 Ann. Cas. 68, it was held that an act making it an offense for a street railway company to fail to provide a sufficient number of cars to accommodate all persons desirous of using the cars, without crowding the cars, but without defining the term "crowding," was too indefinite and uncertain to be enforced, and was void under the Sixth Amendment of the Constitution of the United States. There are other cases of the same general import. State v. West Side St. Ry. Co., 146 Mo. 155, 47 S. W. 959; State v. International & G. N. Ry. Co. (Tex. Civ. App.) 165 S. W. 892.

No doubt, as declared by the Supreme Court of the United States in United States v. Brewer, 139 U. S. 278, 288, 11 Sup. Ct. 538, 541 (35 L. Ed. 190):

"Laws which create crime ought to be so expressed that all men subject to their penalties may know what acts it is their duty to avoid," and "before a man can be punished, his case must be plainly and unmistakably within the statute."

This rule is simple enough, but its application is often fraught with difficulty. Thus, it was generally supposed that the decisions of the Supreme Court in the Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and the Tobacco Case, 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, adopting the rule of reason, rendered the Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) invalid, at least as a criminal statute. Indeed, such seems to have been the view of the Senate Judiciary Committee, as appears from a dissenting opinion of Mr. Justice Harlan in 221 U. S. 97, 31 Sup. Ct. 530, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, from which we quote:

"The Anti-Trust Act makes it a criminal offense to violate the law, and provides a punishment both by fine and imprisonment. To inject into the act the question of whether an agreement or combination is *reasonable* or *unreasonable* would render the act as a criminal or penal statute indefinite and uncertain, and hence, to that extent, utterly nugatory and void, and would practically amount to a repeal of that part of the act. * * * And while the same technical objection does not apply to civil prosecutions, *the injection of the rule of reasonableness or unreasonableness would lead to the greatest variableness and uncertainty in the enforcement of the law. The*

*defense of reasonable restraint would be made in every case and there would be as many different rules of reasonableness as cases, courts and juries.* What one court or jury might deem unreasonable another court or jury might deem reasonable. A court or jury in Ohio might find a given agreement or combination reasonable, while a court and jury in Wisconsin might find the same agreement and combination unreasonable. In the case of People v. Sheldon, 139 N. Y. 264 [34 N. E. 785, 23 L. R. A. 221, 36 Am. St. Rep. 690], Chief Justice Andrews remarks: 'If agreements and combinations to prevent competition in prices are or may be hurtful to trade, *the only sure remedy is to prohibit all agreements of that character.* If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be very difficult in any case to establish the invalidity, although the moral evidence might be very convincing.' * * * To amend the Anti-Trust Act, as suggested by this bill, would be to entirely emasculate it, and for all practical purposes render it nugatory as a remedial statute. Criminal prosecutions would not lie and civil remedies would labor under the greatest doubt and uncertainty. The act as it exists is clear, comprehensive, certain and highly remedial. It practically covers the field of federal jurisdiction, and is in every respect a model law. To destroy or undermine it at the present juncture, when combinations are on the increase, and appear to be as oblivious as ever of the rights of the public, would be a calamity."

Yet it may safely be said that these views have not been shared by the Supreme Court. Thus, in the majority opinion in the Standard Oil Case, 221 U. S. 63, 31 Sup. Ct. 517, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, the Chief Justice said:

"The merely generic enumeration which the statute makes of the acts to which it refers and the absence of any definition of restraint of trade as used in the statute leaves room for but one conclusion, which is, that it was expressly designed not to unduly limit the application of the act by precise definition, but while clearly fixing a standard, that is, by defining the ulterior boundaries which could not be transgressed with impunity, to leave it to be determined by the light of reason, guided by the principles of law and the duty to apply and enforce the public policy embodied in the statute, in every given case whether any particular act or contract was within the contemplation of the statute."

And again:

"So far as the arguments proceed upon the conception that in view of the generality of the statute it is not susceptible of being enforced by the courts because it cannot be carried out without a judicial exertion of legislative power, they are clearly unsound. The statute certainly generically enumerates the character of acts which it prohibits and the wrong which it was intended to prevent. The propositions therefore but insist that, consistently with the fundamental principles of due process of law, it never can be left to the judiciary to decide whether in a given case particular acts come within a generic statutory provision. But to reduce the propositions, however, to this their final meaning makes it clear that in substance they deny the existence of essential legislative authority and challenge the right of the judiciary to perform duties which that department of the government has exerted from the beginning. This is so clear as to require no elaboration. Yet, let us demonstrate that which needs no demonstration, by a few obvious examples. Take for instance the familiar cases where the judiciary is called upon to determine whether a particular act or acts are within a given prohibition, depending upon wrongful intent."

In Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417, the Anti-Trust Law of Texas was upheld as against a charge that the act was too vague and indefinite. A similar ruling was made in Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L.

Ed. 1232. In the latter case, in answer to a similar charge, the court said:

"The objection to the criminal operation of the statute is thought to be warranted by Standard Oil Co. v. United States, 221 U. S. 1 [31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734], and United States v. American Tobacco Co., 221 U. S. 106 [31 Sup. Ct. 632, 55 L. Ed. 663]. Those cases may be taken to have established that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade. 221 U. S. 179 [31 Sup. Ct. 632, 55 L. Ed. 663]. And thereupon it is said that the crime thus defined by the statute contains in its definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men. The kindred proposition that 'the criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty,' is cited from the late Mr. Justice Brewer sitting in the Circuit Court. Tozer v. United States (C. C.) 52 Fed. 917, 919.

"But apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it' by common experience in the circumstances known to the actor. The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw.' Commonwealth v. Pierce, 138 Mass. 165, 178 [52 Am. Rep. 264]; Commonwealth v. Chance, 174 Mass. 245, 252 [54 N. E. 551, 75 Am. St. Rep. 306]. 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' 1 East, P. C. 262. If a man should kill another by driving an automobile furiously into a crowd he might be convicted of murder however little he expected the result. See Reg. v. Desmond, and other illustrations in Stephen, Dig. Crim. Law, art. 223 (1st Ed.) p. 146. If he did no more than drive negligently through a street he might get off with manslaughter or less. Reg. v. Swindall, 2 C. & K. 230; Rex v. Burton, 1 Strange, 481. And in the last case he might be held although he himself thought that he was acting as a prudent man should. See The Germanic, 196 U. S. 589, 596 [25 Sup. Ct. 317, 49 L. Ed. 610]. But without further argument, the case is very nearly disposed of by Waters-Pierce Oil Co. v. Texas (No. 1), 212 U. S. 86, 109 [29 Sup. Ct. 220, 53 L. Ed. 417], where Mr. Justice Brewer's decision and other similar ones were cited in vain. We are of opinion that there is no constitutional difficulty in the way of enforcing the criminal part of the act."

In International Harvester Co. v. Kentucky, 234 U. S. 216, 34 Sup. Ct. 853, 58 L. Ed. 1284, an opposite conclusion was reached, but the case was distinguished from the Nash Case in the following language:

"We regard this decision as consistent with Nash v. United States, 229 U. S. 373, 377 [33 Sup. Ct. 780, 57 L. Ed. 1232], in which it was held that a criminal law is not unconstitutional merely because it throws upon men the risk of rightly estimating a matter of degree—what is an undue restraint of trade. That deals with the actual, not with an imaginary condition other than the facts. It goes no further than to recognize that, as with negligence, between the two extremes of the obviously illegal and the plainly lawful there is a gradual approach and that the complexity of life makes it impossible to draw a line in advance without an artificial simplification that would be unjust."

So in Sears, Roebuck & Co. v. Federal Trade Commission, 258 Fed. 307, 169 C. C. A. 323, the court said:

"Petitioner urges that the declaration of section 5 must be held void for indefiniteness unless the words 'unfair methods of competition' be construed to embrace no more than acts which on September 26, 1914, when Congress spoke, were identifiable as acts of unfair trade then condemned by the common law as expressed in prior cases. But the phrase is no more indefinite than 'due process of law.' The general idea of that phrase as it appears in constitutions and statutes is quite well known; but we have never encountered what purported to be an all-embracing schedule or found a specific definition that would bar the continuing processes of judicial inclusion and exclusion based upon accumulating experience. If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' 'unfaithfulness,' 'unfair use,' 'unfit for cultivation,' 'unreasonable rate,' 'unjust discrimination,' and the like. This statute is remedial, and orders to desist are civil; but even in criminal law convictions are upheld on statutory prohibitions of 'rebates or concessions' or of 'schemes to defraud,' without any schedule of acts or specific definition of forbidden conduct, thus leaving the courts free to condemn new and ingenious ways that were unknown when the statutes were enacted. Why? Because the general ideas of 'dishonesty' and 'fraud' are so well, widely and uniformly understood that the general term 'rebates or concessions' and 'schemes to defraud' are sufficiently accurate measures of conduct."

Furthermore the objection to submitting questions to juries for their final determination grows less each year. Arizona Employers' Liability Cases, 250 U. S. 400, 39 Sup. Ct. 553, 63 L. Ed. 1058; Chicago, R. I. & Pac. Ry. Co. v. Cole, 251 U. S. 54, 40 Sup. Ct. 68, 64 L. Ed. ——.

I will only add in conclusion that the situation confronting Congress was a difficult one at best. To fix profits definitely and arbitrarily, without reference to place or circumstance, would prove unjust and oppressive in the extreme, for it is matter of common knowledge that what would be deemed a just and reasonable profit in one place or as to one commodity would be unjust and unreasonable in another place or as to a different commodity. Congress was therefore compelled to choose between the course pursued and some other course equally difficult, and the wisdom of its choice cannot be made the subject of judicial inquiry. If general conditions are correctly portrayed by the charges contained in these indictments, it will not be denied that there is a crying need for relief of some kind from some source. The aggregate cost price of the articles enumerated in the 76 counts of the indictment against the Spokane Dry Goods Company is $836.26, and the aggregate selling price $1,823.45, or an average profit of 118 per cent., based on the cost price. The aggregate cost price of the articles enumerated in the 66 counts against the Hill Bros. Shoe Company is $273.52, and the aggregate selling price $650.50, or an average profit of 138 per cent., based on the cost price. The aggregate cost price of the articles embraced in the 70 counts of the indictment against the Culbertson-Grote-Rankin Company is $492.11, and the aggregate selling price $1,139.81, or an average profit of 131 per cent., based on the cost price. That such prices or profits are extortionate no one will deny. Of course, if confined to the three stores in question, or to only

a few stores, the people have a remedy in their own hands by withholding their patronage, and if they fail to make use of that remedy to the fullest extent they alone are to blame. On the other hand, if these conditions are general, and to continue indefinitely, the people are without remedy, except through governmental action, and I have little doubt that all the powers of government, both state and federal, will grapple with the evil, and that a remedy will be found well within constitutional limitations. It is to be hoped that such recourse will not be found necessary, as all history shows that the course of legislation, like the sum of human existence, is made up of extremes rather than of means, and if repressive measures are resorted to the day of sunshine for the transgressors may be turned into days of gloom, if not despair.

The case has been most ably presented, and if error results the court alone is responsible. It may be that Congress has transcended its constitutional powers, it may be that there is no connection between the selling price of some small article of female attire and the prosecution of a war, which has passed into history and is little more than a memory, and it may be that the act of Congress is void for uncertainty; but I am not prepared to so hold.

The demurrers are accordingly overruled.