STATE EX REL. HUSTING vs. BOARD OF STATE CANVASSERS and others.

*December 9—December 11, 1914.*

*Elections: Returns: Canvass: Time for completion not affected by recount proceedings: Construction of statutes: Constitutional law:* Mandamus.

1. It is the duty of the court to firmly maintain its own function, but not trespass upon that of the legislature.  The former requires solution of doubts respecting legislative purpose intended to be embodied in an enactment and the pronounced result becomes, in effect, written into such enactment.
2. If by judicial construction a legislative enactment embodies a purpose which is unconstitutional it must be condemned.

---

[1] The mandate of this court in *Illinois Steel Co. v. Rogall* was amended so as to read as above, on February 9, 1915.—REP.

3. If part of an enactment is unconstitutional and the remainder is not, and is reasonably complete by itself, and the former was not such inducement to the entirety but what the latter might, within reasonable probability, have been enacted by itself, to that extent it should be approved and otherwise disapproved.

4. If a legislative enactment is so uncertain that the court cannot determine with any reasonable degree of certainty, what its purpose was, or if it be so incomplete that it cannot be executed, it must be condemned as void.

5. In construing an ambiguous legislative enactment some established rules are to be observed as unwritten law with all the force of written law, and among them:

(a) No attempt to read a legislative enactment different from its plain words and evident meaning on its face is legitimate, if so read it "leads to no absurd consequences."

(b) There should be real uncertainty of meaning found in a legislative enactment before resorting to reading it by aid of rules for judicial construction.

(c) Whether the meaning of words of an enactment are plain is to be determined with reference to the connections in which they are used, the subject dealt with, the circumstances at the time, and the object in view.

(d) The term "and leads to no absurd consequences" requires the rule that ambiguity requiring judicial construction may as well arise from applying the literal sense of words to the subject dealt with as from uncertainty of the words themselves.

(e) An intent, however apparent, which cannot reasonably be read out of a legislative enactment, should not be adopted, but an intent, however absurd, which can be so read and shows clearly the legislative purpose beyond reasonable doubt, must be adopted regardless of the effect upon validity.

(f) The very letter of an enactment may be violated to carry out a manifest legislative intent, so long as it can be found expressed within the reasonable scope of the language used.

(g) Where there is irreconcilable conflict between a legislative enactment and an earlier law, a presumption arises of a purpose to modify or repeal the latter; but that is rebuttable by circumstances and, among them, that the existing law constitutes an entire system and the later enactment would render the entirety unconstitutional or absurd.

6. Under sec. 1, art. XIII, of the state constitution, the political year of the state commences on the first Monday of January of such year and all constitutional officers elected at the November election in any year are required to be circumstanced to take up their respective offices at such time.

7. The legislative plan for accomplishing the requirement mentioned in the last foregoing paragraph, as embodied in ch. 5, Stats., undisturbed by ch. 328, Laws of 1911, inserted in said chapter at sec. 86, does not admit of any change which would, or might probably prevent such accomplishment.

8. Such legislative plan contemplates a fixed limit of time for a county clerk to complete the canvass of election district returns, to decide upon the result, to issue certificates of election to county officers found elected, and to make returns of the result of the election as to state officers to the secretary of state.

9. The statute requires the entire result of the county canvass to be covered by a single decision and the result, as to the state officers, to be included in a single return.

10. The duty of the county canvassing board, independently of the law of 1911, is purely ministerial; it is required to obtain possession of the district returns within the time specified; it may have a remedy by *mandamus* to enable it to do so, if necessary, and may be compelled by *mandamus*, if necessary, to complete its work within the required time.

11. The statute requires the secretary of state and state canvassing board to obtain possession of the county results by the time fixed by statute for commencement of continuous work of making the state canvass, to complete it, file the decision and issue certificates of election in the time limited by statute.

12. Sec. 86, Stats. 1913, cannot be restrained so as to affect some officers and not others; it includes all so plainly as to preclude any different meaning being adopted by construction.

13. Sec. 86, Stats. 1913, cannot be given such effect as to prevent making the county canvasses and state canvass within the time required by law, as that would be liable to prevent newly elected officers from taking their respective offices on the first Monday of the political year.

14. If the legislative purpose was as indicated in sec. 86 in its letter so far as it, if executed, would prevent a county canvass and the state canvass from being completed within the time fixed by statute, it is unconstitutional.

15. If the legislature did not intend the law of 1911 to be restrained so as not to impair the efficiency of the existing law, the purpose is too much involved in obscurity to be discoverable with the reasonable degree of certainty essential to effect being given thereto.

16. No effect can be given to a legislative enactment, however broad its provisions, further than to harmonize it with existing law which is necessary to a constitutional requirement, and if a law

be held to have been intended otherwise the court must declare it void for uncertainty or unconstitutionality.

17. The statute requiring the state canvassing board to complete its work within a specified time is directory, to the extent that it may continue to a finality after expiration of the time, but it has no discretion to delay by adjournments or for anything but proceedings to compel transmission of the county returns, and, in case of delays otherwise, it may be coerced by the *mandamus* remedy.

18. Under sec. 94e, Stats. 1913, the state board of canvassers must make its decision from the county returns mentioned in sub. 1, sec. 87, and from such returns only. The statute contemplates but one return and that to be an entirety.

[Syllabus by MARSHALL, J.]

BARNES, J., and WINSLOW, C. J., dissent.

THIS was a *mandamus* action instituted by an alleged successful candidate, at the November election, 1914, for the office of United States senator for Wisconsin, to compel certain boards ·of county canvassers to complete the canvass of original returns from the several election precincts in their respective counties without waiting upon the result of recount proceedings under·sec. 86 of the Statutes, and to deliver the duly certified results to their respective county clerks; and to compel such county clerks to, thereupon, transmit such certified results, in due form, to the secretary of state as required by statute; and to compel the *State Board of Canvassers* and secretary of state to perform their duties as to acquiring possession of such certified results, and such *State Board of Canvassers* to proceed, diligently, to canvass such returns and complete the duties prescribed by secs. 94 to 94e, Stats., inclusive, as therein prescribed, without waiting upon termination of proceedings under said sec. 86, Stats.

Such proceedings were duly had in the action that, as to each of the defendants, the question was raised of whether a county board of canvassers, under sec. 81, Stats., and the *State Board of Canvassers,* under sec. 93, Stats., are required to perform their respective duties without awaiting the re-

sult of proceedings under said sec. 86, Stats. If the affirmative should prevail peremptory writs of *mandamus* should issue as prayed for.

For the relator there was a brief by *John A. Aylward, M. B. Olbrich,* and *W. H. Timlin, Jr.,* and a separate brief by *Timlin, Dean & Nebel* and *W. H. Timlin, Jr.,* and the cause was argued orally by *Mr. Olbrich, Mr. Aylward,* and *Mr. Timlin.* They argued, among other things, that the recount statute in question has no application to a recount of the ballots cast for United States senator. Sec. 86, Stats. 1913, had its origin in sec. 234*a*, How. Ann. Stats. Mich. Supp. 1883–1890. Having been taken from Michigan, its construction was taken with it and became a part of the law of this state. *State v. Pabst,* 139 Wis. 561, 121 N. W. 351; *State v. Bullen,* 143 Wis. 512, 128 N. W. 109; *Koepp v. Nat. E. & S. Co.* 151 Wis. 302, 312, 139 N. W. 179; *Kranz v. Wis. T. Co.* 155 Wis. 40, 44, 143 N. W. 1049; *Manitowoc C. P. Co. v. M., G. B. & N. W. R. Co.* 135 Wis. 94, 102, 115 N. W. 390. It had received in Michigan a construction which expressly excluded its application to a representative or senator in Congress. *Belknap v. Board of Canvassers,* 94 Mich. 516, 54 N. W. 376. See, also, *Weston v. Probate Judge,* 69 Mich. 600, 37 N. W. 698; *Naumann v. Board of City Canvassers,* 73 Mich. 252, 41 N. W. 267; *Wheeler v. Board of Canvassers,* 94 Mich. 448, 53 N. W. 914; *Vance v. Board of Canvassers,* 95 Mich. 462, 54 N. W. 1084. The delays possible under the statute demonstrate that it has no application to United States senator. *State ex rel. Kustermann v. Board of State Canvassers,* 145 Wis. 294, 307, 315, 130 N. W. 489; *State ex rel. Kletzsch v. Widule,* 158 Wis. 387, 149 N. W. 212; McCrary, Elections (4th ed.) § 302. To apply the statute to United States senator would require a physical impossibility or deny relator a constitutional right.

The *Attorney General,* for the defendant *State Board of Canvassers,* cited 36 Cyc. 1160; McCrary, Elections (4th ed.) § 282; 15 Cyc. 383, 384; *State ex rel. Kustermann v. Board of State Canvassers,* 145 Wis. 294, 130 N. W. 489; *Gilleland v. Schuyler,* 9 Kan. 569; *Newton v. Board of Canvassers,* 94 Mich. 455, 53 N. W. 1043; *McKenzie v. Board of City Canvassers,* 70 Mich. 147, 38 N. W. 11; *May v. Board of Canvassers,* 94 Mich. 505, 54 N. W. 377; *Packard v. Board of Canvassers,* 94 Mich. 450, 53 N. W. 934; *Garth v. Campbell,* 130 Mich. 283, 89 N. W. 950; *Stockton v. Powell,* 28 Fla. 1, 10 South. 688; *State v. Gibbs,* 13 Fla. 55; *Att'y Gen. v. Board of County Canvassers,* 64 Mich. 607, 31 N. W. 539; *Smith v. Lawrence,* 2 S. Dak. 185, 49 N. W. 7; *Board of Education v. Welch,* 51 Kan. 792, 33 Pac. 654; *State ex rel. Reyburn v. Ringo,* 42 Mo. App. 115; *Mullins v. McKeel,* 24 Ky. L. Rep. 402, 68 S. W. 643; *Belknap v. Board of State Canvassers,* 95 Mich. 155, 54 N. W. 696; *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567, 797.

*L. G. Wheeler,* for the defendant *Board of Canvassers of Milwaukee County.*

*A. C. Umbreit,* for the defendant *McGovern.*

The cause was submitted to the court for determination and because of the exigency involved the following decision reached by the court was rendered without delaying for the purpose of preparing an opinion, resting the matter *in præsenti* by a brief statement of reasons, that to be followed later by an opinion.

The court considers that the several challenges of the claim that the various boards of canvassers should proceed to perform, diligently, their respective duties, as contended on behalf of the relator, should be overruled, basing such decision on this, in detail:

Sub. 1, sec. 87, Stats., requires the result, as to any county, of the election therein of officers mentioned in such section to

be sent by the county clerk of such county, duly certified, to the secretary of state within the time specified in such section, and it cannot be- delayed to wait upon the result of proceedings under sec. 86; Stats., and if such duty shall be omitted the right to a remedy by *mandamus* arises to compel performance; though reasonable time may be allowed to comply with the writ,—not delaying to complete proceedings under such section so as to prejudice reasonable performance under said sub. 1, sec. 87, Stats. Such undue delay would not be legally justifiable.

Under sec. 94*e,* Stats., the canvassing board must make its determination from the returns mentioned in sub. 1, sec. 87, Stats., and from such returns only. The statute contemplates but one return from each county and not returns in sections.

Sub. 2, sec. 94, Stats., requires the secretary of state to secure returns to be made as contemplated by sub. 1, sec. 87, and in case of omission so to do by the time mentioned in sub. 2, sec. 94, Stats., a right arises to a remedy by *mandamus* to compel performance of that duty.

Sub. 1 and 2, sec. 94*a,* Stats., requiring the *State Board of Canvassers* to meet on the 1st day of December succeeding a general election for the purpose of canvassing the returns and determining the result of such election and to perform its duties as such canvassers, subject to the right to adjourn for not more than ten days in all, is unaffected by sec. 86, Stats., though it is directory, in that the board does not lose jurisdiction to perform such duty by not completing its work without delaying to receive completed returns; but its duty is to proceed diligently to the end; securing possession of any missing returns as speedily as practicable. Such duty is absolute and unaffected by pendency of proceedings under sec. 86, Stats. In case of neglect to perform such duty a right arises to a remedy by *mandamus* to compel performance, though reasonable time may be allowed to make return to the writ, delay

because of proceedings under sec. 86, Stats., not being legally justifiable.

Time for permissible delay of the state canvass having expired;

*By the Court.*—Ordered, that peremptory writs of *mandamus* be issued in accordance with the foregoing, due return to be made to such writs with all convenient speed and not later than the 15th day of December, 1914; that the motion to quash the alternative writ be denied, and that the demurrer to the returns be sustained.

The following opinions were filed January 12, 1914:

Conformable to the purpose as aforesaid of following at a later time the decision by an opinion covering the questions involved in the cause and discussed by counsel in submitting it, this has been agreed to so far as stated impersonally:

MARSHALL, J. Upon the court in this cause devolved the duty of determining the legislative intent, if possible, with any reasonable degree of certainty, embodied in ch. 328, Laws of 1911 (sec. 86, Stats.), and if that should be accomplished, perhaps, to determine to what extent the enactment is constitutional and how it applies to the facts required to be dealt with in the particular case, and if that should not be accomplished, to adjudge the act void for insolvable indefiniteness.

The field of duty suggested is the very highest and the most onerous incident to the supreme judicial function. While it requires a superlative degree of respect for the lawmaking power, it calls for a correlative degree of appreciation of the trust reposed here in respect to the matter, and of industry and courage to fully discharge it, regardless of the wishes of immediate parties to the litigation, or of any person or number of persons, and regardless of consequences to the personal

instrumentalities here. The individual is here today, tomorrow, comparatively speaking, another is in his place; but the court lives on in its great impersonality, vindicating the wisdom which founded our system of government according as the design of it shall be appreciated and those who give it vitality come up to the ideal standard contemplated by the designers. No other attempt at a popular system has been enduring because no other system has had within itself the means, without violence, of remedying every defect which time and experience might develop or changed conditions re quire. There is no element in our system so vital to its efficiency for insuring to the people continued and full possession of their rights, as the independent division of the whole, vitalized by instrumentalities selected by the people, and answerable for the fidelity with which they perform their solemn obligation, only to the people. The restiveness sometimes observed, even in the learned profession of law, and often outside of it, because of the exercise of this particular function so as to produce results contrary to individual or factional, and sometimes popular notions, is rather evidence of defective conception of "that fundamental instrument under which all enjoy all the rights most dear to freemen, and to the support of which we are bound by the most solemn obligations which can possibly be imposed upon members of a social political organization," than of usurpation or faulty administration.

Perhaps it takes long judicial experience to appreciate how very important it is to have an independent authority to determine from the mass of things coming from legislative activity, what is legitimate and what is not, what is understandable and what is not, and what fits into existing law so as to be capable of being administered, and what does not. In this mass of things there are bound to be omissions, ambiguities, inconsistencies, contradictions within and between the within and the without, and sometimes violations of fundamental law. It was from that viewpoint that the power to

do what we are called upon to do in this case, was created and lodged here.   The necessity for activity of that power has grown very much in recent years, as the apparent and real necessity for regulation of things has been vitalized by a rapidly increasing mass of legislation, and perhaps by methods which have been very deterrent of individual study of enactments by those responsible for their appearing upon the statute books.

The field of the judicial function in dealing with such a law as we have before us, is closely fenced about.   The court, while firmly maintaining its own function, must not pass beyond into the domain of legislative power.   For the purpose of getting the sense out of an enactment, which the legislature purposed putting into it, not substituting some different sense therefor, or putting sense into the enactment where none can be evolved from it, words may be transferred, or rejected as surplusage, or given a very restrictive or comprehensive meaning, according to the evident intent, or supplied where manifestly in place by necessary or reasonable implication, and other liberties may be taken with an enactment, where necessary to solve uncertainty, so long as the effort goes no further than to reasonably read out of the legislative language that which was intended to be placed therein, and was discoverably so placed.   But after exhausting all reasonable efforts to that end, if the discovered sense violates constitutional restrictions, the court must put its stamp of disapproval on it.   It has no discretion in the matter.

If the law, given effect in its letter, would lead to consequences absurd or so unreasonable that by no fair probability was it so intended, yet a meaning from another viewpoint can be seen in the language which would avoid such consequences, and may probably have been intended, that should be adopted.   But if some parts of an act are bad, fundamentally, or otherwise incapable of execution, yet such parts were not so far the inducement to the entirety that the legislature would probably not have enacted the balance by itself,

then the residue is to be approved and the invalid or fatally indefinite or contradictory parts condemned. If the enactment is so uncertain that the court is unable to determine, with any reasonable degree of certainty, what the legislature intended, or it is so incomplete that it cannot be executed, there is no other course open but to condemn it as void for uncertainty, as this court has done on other occasions, and other courts have done so often that the duty in that regard has become a matter of unwritten law. *Norton v. Reed,* 6 Wis. 522; *State v. Wentler,* 76 Wis. 89, 44 N. W. 841, 45 N. W. 816; Lewis's Sutherland, Stat. Constr. (2d ed.) § 86 and cases cited. As well said in *State ex rel. Crow v. West Side St. R. Co.* 146 Mo. 155, 47 S. W. 959:

"An act of the legislature, to be enforceable as a law, must prescribe a rule of action, and such rule must be intelligibly expressed. . . . It is manifest that an act of the legislative department cannot be enforced when its meaning cannot be determined by any known rules of construction. The courts cannot venture upon the dangerous path of judicial legislation to supply omissions, or remedy defects in matters committed to a co-ordinate branch of the government. It is far better to wait for necessary corrections by those authorized to make them, or, in fact, for them to remain unmade, however desirable they may be, than for judicial tribunals to transcend the just limits of their constitutional powers."

We may well state here a few familiar rules governing the subject of interpretation and construction of statutes. They are a part of the unwritten, and as binding on courts as written, law.

(1) A statute is not to be viewed as if it were open to construction as matter of course. That is the first and primary rule for judicial guidance. It has been most commonly phrased as by Vattel (Law of Nations, book 2, § 263):

"It is not allowable to interpret what has no need of interpretation. . . . When the meaning is evident and leads to no absurd conclusion, there can be no reason for refusing to

admit the meaning the words naturally present.   To go else-
where in search of conjecture, in order to restrict or extend
them, is but an attempt to elude them."   "Such a method if
once admitted would be exceedingly dangerous, for, there
would be no law however definite and precise in its language,
which might not, by interpretation, be rendered useless."

Thus it is clear, that need for construction takes hold where
uncertainty of legislative meaning begins.

(2) Like all rules laid down in concise general terms in
the old legal classics, the meaning of the foregoing basic pre-
cept has required and received elucidation which is a vital
feature of it.   "Words which are plain" do not mean, neces-
sarily, in their literal sense.   Language has a scope of mean-
ing which includes literal sense,—that is a common ordinary
meaning,—and a broader or restrictive meaning, according
to the connections, subject dealt with, and objects in view.
So whether words are plain or not, is to be viewed with ref-
erence to all these matters.   If the meaning is manifest, it
must be taken regardless of consequences, whether beneficial
or harmful or fundamentally bad or fatally uncertain.

(3) The term "and leads to no absurd consequences" is
important.   In explanation of that feature we have the sub-
sidiary rule that, while ambiguity is an absolute condition of
construction, it may as well arise from application of words
to their associates, the subject dealt with, or object to be at-
tained, in legislative contemplation,—some or all of these
features, as from literal sense.

(4) While it is presumed that simple words used in a leg-
islative enactment were intended to be taken in their com-
mon ordinary sense; and that, in general, such is to prevail,—
(*Absoluta sententia expositore non indiget*),—it is rebuttable
in several ways, particularly by the principle that, the legis-
lature, if it can possibly be avoided, is not to be convicted of
intending absurd results or such unreasonable consequences
as would shock one's common sense; but neither rules of lan-

guage nor of law can properly be violated to avoid such penalty, whether it be public condemnation for an oppressive enactment or judicial nullification.

(5) The extent to which the court may go before reaching the result suggested is very great, if it keeps in mind, as the chief guide, effectuation of the legislative intent; but that intent must be read out of the law, either by looking at the words themselves or at them in the light of the characterizing features we have mentioned. An intent, however manifest, not discovered in the law and capable of being vitalized within the scope of it and fundamental restraints, must fail. As said by Lord CAMPBELL in *Coe v. Lawrance,* 1 El. & B. 516, and often approved by this and other courts: "I really cannot doubt what the legislature intended to do: but they have not carried it into effect. . . . It is better that we should adhere to the words they have used, than that we should strive to amend it." Also by Lord TENTERDEN in *Rex v. Barham,* 8 Barn. & C. 99: "It is better to abide by this consequence than to put upon it a construction not warranted by the words of the act, in order to give effect to what we may suppose to have been the intention of the legislature." However, the very letter of an enactment may be violated to carry out a manifest legislative purpose, so long as the reasonable meaning be not overstepped.

(6) Within the principle last stated, where there is an irreconcilable conflict between the apparent meaning of an enactment and that of existing statutes, a presumption arises that the legislature contemplated no such result; but rather that the earlier law should be regarded as repealed or modified so as to preserve harmony; but that is rebuttable, efficiently, in several ways, at least so as to produce fatal uncertainty, particularly where the existing law consists of a system, perfect in itself as regards producing constitutional results, and the new feature very seriously interferes therewith and might do so fatally. If the fact be that, given ef-

fect, an apparent purpose would appear to disturb an established system of written law, covering a vital field in our system of government—such as the reasonably speedy determination, *prima facie* at least, of the result of the election of persons to fill the various United States, state, and county offices,—the fact that such effect would be very remote does not efficiently neutralize the infirmity. If such might be the legislative effect without any fatal abuse, though quite improbable, that constitutes an infirmity which only the legislature can cure. *Fifield v. Close,* 15 Mich. 505.

(7) If after judicial labor to so construe a law shall have been exhausted, and some part of the enactment still is fatally uncertain or fundamentally bad, yet the rest of it constitutes, by itself, a legitimate idea within legitimate intention, and it shall appear that the valid part would have been enacted had it been appreciated that the other part was invalid, the one may be saved and the other not.

The foregoing observations and statement of principles, I have thought best to place in this opinion as a preliminary to search for the legislative meaning of the act of 1911, in question, and, if such search be successful, the extent to which such meaning can be legitimately given effect.

If one approaches the judicial analysis of a legitimate enactment—when so challenged as to raise the question of fatal inconsistency, uncertainty, or unconstitutionality—with proper conception of judicial authority and duty, and proceeds, by the very closely fenced about method of fundamental and unwritten law, to the finality, there is little or no danger but that the mists which may at first surround the point of destination, will be so cleared away as it is approached, that the judicial anchor may, in the end, be so confidently and clearly cast at the right spot, as to satisfy all who are so equipped as to intelligently study the matter and look at it through the vista of reason rather than that of partisan desire or defective notions of, or mental disloyalty to

our tripartite divisional system of government, having the whole power of the people to say what the law is, intrusted to the judicial department.

Under sec. 1, art. XIII, of the state constitution, the political year commences on the first Monday of January. All constitutional elective state and county offices are to be refilled once in two years and the election, on each occasion, is required to be on the Tuesday succeeding the first Monday of November preceding the commencement of the next political year.

Thus, the time intervening between an election and that for the newly chosen to be possessed of the primary right to take their respective offices and to otherwise duly qualify therefor, is fundamentally limited to, substantially, sixty days. In that time there must be a canvass of the votes cast in the several election districts; a return of the results to county authority in the matter, the enforcement thereof, if need be, and correction of defective district returns; the county canvass of such returns and return thereof to state authority; enforcement of such return, if need be, and correction of defective returns, and canvass thereof. The various steps call for performance of purely ministerial duties and singleness of return in each case; whether of district canvass to county authority or county canvass to state authority. It may be the legislature could disturb the unity of system and singleness of feature, as to returns, so long as certainty were not jeopardized of reaching the final result by a reasonable time before commencement of the political year to enable the newly elected to be ready at the appointed time to take office; but, any disturbance liable to go further would be of very doubtful constitutionality, and would be productive of such confusion in public affairs that anything short of an express purpose in that regard would leave the legislative effort too uncertain of meaning to be adopted as within legislative intention.

Consistent with the constitutional plan as to the political

year and brief time between choice of all state and county elective officers for determination of results and qualification of candidates by *prima facie* right and otherwise to take office, and in substantial harmony with the law as it existed at the time of the formation of the constitution, which its framers evidently had in view, the legislature, early, provided for the necessary administrative machinery.   Ch. 6, R. S. 1849. That remained without any material change until passage of the law of 1911 which is here involved.   Ch. 7, R. S. 1858; ch. 5, R. S. 1878; ch. 5, Stats. 1898, Stats. 1911, and Stats. 1913.

The plan of administration aforesaid was judicially reviewed in *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567,—it being held that all the proceedings from initiation of an election up to the final qualification of the newly elected to take the oath of office are purely administrative and exclusive—though not beyond judicial review after the manner of legal remedies—and that the law contemplates but one ministerial canvass,—that to be complete in every respect,—first in the election districts, then in the counties, and then by state authority,—the decision of the administrative board in each case, to cover the subject within the scope of its duty as an entirety,—first the initial authority and then the county authority,—by a single return.   The decision, in effect, is that county certificates of election are all due at one time, the several rights to wait upon completion of the canvass, and statement certifying the same.   Returns in sections or of a supplemental character, or made otherwise than by the officers and in the manner and time specified in the written law, were held to be *ultra vires* and not to be considered by the canvassing boards.   Very strict adherence to this system was thought to be necessary, evidently for many reasons, particularly because of the purely administrative character involved, and the expedition and positive character of each step necessary to efficiently traverse the course from election day to the time for incumbency of the various offices to change.

Conformably to that, the legislature early adopted that which, without any considerable change, has been preserved through all the revisions since 1858, and is now found in sec. 94e, Stats. It originated in ch. 78, Laws of 1858, evidently, at the first opportunity after the excitement and partisan feeling caused by the Bashford-Barstow contest had subsided so as to give time for calm reflection and judgment. As first adopted, with such eliminations and interpolations as necessary to fit it into the present system of chapters and sections, it is as follows:

*Canvass, how made.* Section 94e. The board of state canvassers, in canvassing to ascertain the result of any election, shall canvass only the regular returns made by the county boards of canvassers, as provided in this chapter, and shall in no case canvass or count any additional or supplemental returns or statements made by any such board or by any other board or person whatever; nor shall the board of state canvassers canvass or count any statement or return of the result of any canvass which shall have been made by any county board of canvassers at any other time than that mentioned in this chapter.

The decision in the *Bashford Case* was approved in *State ex rel. McDill v. Board of State Canvassers,* 36 Wis. 498. The court held that a canvassing board cannot go into the subject of frauds or illegalities in the election for the purpose of awarding a certificate of election to the person legally elected, other than such as appertains to complete performance of the ministerial duty of canvassing, counting, tabulating, and returning the number of votes actually cast, and the persons for whom cast. All idea of complaints before a canvassing board of frauds or illegalities, other than as indicated, followed by trials upon evidence given by witnesses with the characteristics of a trial, as between party and party, represented in person and by attorney, was rejected most emphatically.

The first step after the election is the canvass by district authority and return to county authority. One week is af-

forded for this feature to work out so as to enable the latter authority to operate. Sec. 81, Stats. Time and machinery are provided for securing belated returns and correcting mistakes before commencement of the county canvass,—such commencement not to occur until correct returns shall be in hand from all the districts. Secs. 81, 82. This time is limited by the seventeen days allowed for transmission of county returns to the secretary of state. Sec. 87, Stats. Thus about twenty-four days are set aside for the matters aforesaid, at the end of which time the result of the county canvass is required to be published (sec. 84, Stats.), and certificates of election to be issued as to county officers and returns to be made to the secretary of state as to state offices. The latter is, plainly, to wait upon the time for issuance of the local certificates because the canvass is required to be an entirety.

At the end of the activities stated, that of state authority commences. Formerly the time set for that was December 15th after the election. Now it is December 1st. Sub. 1, sec. 94a. The change was made by ch. 459, Laws of 1913.

Thus it will be noted that, whereas, prior to 1913 state authority was afforded some fifteen to seventeen days to secure possession of county returns and prepare to enter upon performance of the duties of making a state canvass, only two days or thereabouts are now afforded, with power to adjourn as necessary, not more than ten days, as formerly, before proceeding to the continuous work of reaching a final result. Sub. 1, sec. 94a. Like the county canvass, the statute contemplates that the state canvass shall be entered upon only when all returns are in, and be closed as to all offices, by a single decision.

Prior to the amendment of 1913 there was a limit of about twenty days for the state board of canvassers to do its work; but the actual time, it was evidently thought by the legislature, should be short because, after the first ten days, no time of adjournment was provided. Expedition, in view of the short time left for commencement of the next political year,

was evidently contemplated, since it was provided that upon a decision being reached, certificates of election should be forthwith issued. Sec. 94b, Stats. Provision was made for only one decision, to be embodied in one statement, that to be spread upon the record as a basis for the *prima facie* evidences of the right of the successful candidates. Sub. 4, sec. 94a, and sec. 94b, Stats.

From the foregoing, it is easily seen that, the time limit upon the county board of canvassers is too short to admit of any interference, except for correction of mistakes, apparent upon mere inspection. Complaints, with charges of fraud and invalidity, involving trials, somewhat after the manner of judicial investigations, are out of the question, if the consequence would be to delay the final closing of the county canvass by the time limited therefor. Neither such time nor that for state authority to act, admits of much interference without probabilities of the constitutional requirements being invaded.

As indicated, seventeen days spans the time afforded a board of county canvassers. When the change took place which gave rise to this litigation, about the same time was afforded to state canvassers, with ten days for necessary adjournments. The total has been increased fifteen days by reducing the period of preparation for organization of the board to that extent. The period for necessary adjournments remains the same as before. So it is quite evident that there was no thought of changing the time to accommodate delays in completing the work of county authority and filing the evidence thereof. Had that been in the legislative mind, the time for commencement of the state canvass would have been placed later instead of fifteen days earlier than formerly, since the origin of the system, until two years after the change in 1911.

No more need be said to demonstrate that the statutory period provided for from 1858 to the change in question for completion of the work of county authority in respect to the

subject under discussion, and the time for everything to be in hand for the work of state authority in respect to such matters, is of such vital importance,—in view of the required status of the newly elected officers at the opening of the political year succeeding their election,—that there was little or no room for the court, in the *Bashford-Barstow Case,* to come to any other conclusion than that the time and manner prescribed for doing the work was not directory so as to permit variation as to period of completing of the statutory tasks. That is so vital that a material change ought not to rest in mere statutory construction. Certainly, an additional paragraph, having no express relation to the system as a whole, should not be so construed as to efficiently interfere with the constitutional requirement for the newly elected to be conditioned to take their respective offices at the beginning of the political year. The contrary would be so unreasonable, the court should not convict the legislature of intending it.

Now we will turn to the act of 1911 under which the recount proceedings were instituted. Such proceedings were in progress when this action was commenced, with strong probabilities of delaying issuance of county certificates of election until after expiration of the time for making the returns to the secretary of state as required, in letter, by sec. 85 and sub. 1, sec. 87, Stats., and threatening to delay the state canvassing board from going on with its work to final effect without adjournment within the time prescribed by the letter of secs. 94$a$ and 94$b$ and the constitution as well.

The new feature, without any repealing clause or other express change of existing statutes, was projected into the body of the old system between sec. 85, Stats., relating to the final act of the county canvassers, and the section requiring the returns to the state secretary to be made within seventeen days after the election, in these words:

"1. Whenever any candidate, voted for at any primary or election, shall, on or before the last day of the meeting of the board of county canvassers, file with the county clerk a veri-

fied petition setting forth that he was a candidate for a specified office at said primary or election, and that he is informed and believes that a mistake or fraud has been committed in specified precincts in the counting or return of the votes cast for the office for which he was a candidate, or specifying any other defect, irregularity or illegality in the conduct of said primary or election, said board shall forthwith proceed to ascertain and determine the facts alleged in said petition and make correction accordingly and recount the ballots in every precinct so specified in accordance therewith. Such petition shall first be served, as in case of summons in a court of record, upon all opposing candidates, if an election, and the opposing candidates of the same party, if a primary. Such petition and proof of service thereof shall be filed with the county clerk, together with a fee of two dollars for each precinct in which a recount of the ballots is demanded in said petition. The affiant and all opposing candidates shall be entitled to be present in person and by counsel and observe the proceedings.

"2. Each member of said board of canvassers, for the purposes mentioned in this section, shall have power to administer oaths, certify to official acts and issue subpœnas, and the provisions of section 1797—13, with regard to compelling the attendance of witnesses, shall apply to the proceedings before such board, except that the fees of witnesses shall be paid by the county.

"3. Within five days after the determination of said board, any candidate aggrieved thereby may appeal therefrom to the circuit court of said county, by serving a notice in writing to that effect upon such other candidates who appeared before said board. Such notice shall be filed with the clerk of the circuit court, together with an undertaking by the appellant, with surety to be approved by the clerk of said court or the judge thereof, conditioned for the payment of all costs taxed against said appellant. The circuit judge shall forthwith issue an order directing the county clerk of said county to transmit to the clerk of said court forthwith all ballots, papers and records affecting such appeal and fixing a time and place for hearing thereon, in open court or at chambers, or before a referee, not later than five days from the making of such

order. Such order shall be served upon the county clerk and all such other candidates who have appeared before said board. A reference may be ordered upon any or all questions. At the time and place so fixed the matter shall be summarily heard and determined and the costs taxed as in other civil actions.

"4. Nothing in this section shall be construed to abrogate any right or remedy that any candidate may now have affecting the trying of title to office."

The method, indicated, of constructive work, is of modern use, so far as this state is concerned. To thrust an important provision with many details into an existing statutory system for dealing in the entirety with a basic part of state organization,—no express regard being paid in the body of the new creation to inconsistencies between it and the letter and spirit of the context and without any repealing clause,—would naturally lead to such confusion as we have now to deal with. An abandonment of the method would promote certainty, lessen litigation growing out of ambiguities and incongruities in legislative enactments, promote discovery of legislative intention, and lessen danger of such intention failing or being more or less involved in obscurity.

What did the legislature mean by the language, "Any candidate, voted for at any primary or election?" Note that it applies to every candidate for a county, federal, and state office. The language is too plain in that respect to admit of any question.

We note that the supreme court of the state of Michigan in dealing with a similar situation, in several instances, held that the offices to which the law would not apply without absurd results, or results entirely inconsistent with administration under other enactments not referred to, were not within its purview. *McGuire v. Circuit Judge*, 69 Mich. 593, 37 N. W. 568; *Wheeler v. Board of Canvassers*, 94 Mich. 448, 53 N. W. 914; *Belknap v. Board of Canvassers*, 94 Mich.

516, 54 N. W. 376; *Naumann v. Board of City Canvassers,* 73 Mich. 252, 41 N. W. 267; *Vance v. Board of Canvassers,* 95 Mich. 462, 54 N. W. 1084.

That is an easy way to revise uncertain legislative work, but we are constrained not to yield to the urgency of counsel to follow it. When the legislature, in language as plain as can be chosen to express an idea, declares that "any candidate, voted for at any primary or election" shall have the benefit of a particular remedy, as in the act in question, it would be taking more liberties therewith, than would seem to us within the judicial function, to restrict it to such offices as it might reasonably have been made to apply to, and not apply it to the rest, where there is as much reason in one class as in the other, as regards need for such a remedy. How can the court say, with any fair degree of certainty, that the legislature did not intend just what its language naturally imports? To our minds it falls within the rule precluding revision by judicial construction.

Again, how can it be held, under rule 7 stated, with any fair degree of certainty, that the legislature would have favored the proposed enactment had it been supposed it might be applicable or not, according as the court might deem practicable, saving the letter and spirit of existing legislation? It seems to me that there is too much uncertainty at this point for holding that the enactment may be saved in part and condemned in part.

Assuming, as we must, that the legislature did not intend to disregard the constitutional requirement for newly elected officers to be in readiness to take office at the commencement of the new political year, how can we say with any reasonable degree of certainty, that could be done without disturbing the existing law, since the provisions thereof and those of the new enactment cannot stand together without the one yielding to the other? Looking at the matter from that viewpoint, in view of the obstacles in the way, can it be held with any rea-

sonable degree of definiteness, whether the legislature pur-
posed having the later act restrained to harmonize with the
earlier one, or that the latter should be held modified to har-
monize with the former ?

Taking one horn of the dilemma described, and we are met
with the plain letter of the act with no method of changing it
except by adding words in a legislative way, contrary to our
rule 5 and others.   Taking the other horn of the difficulty
and we are met with such a "Pandora's box" of difficulties
that one would hesitate to lift the lid lest they should irre-
trievably escape with serious vexatious consequences and leave
not even hope.

There is the capacity for any candidate to institute a re-
count proceeding while yet the canvassing board is in service.

· There is the possibility for recount after recount, tacking
one to the closing activity of another· and in the aggregate
lasting long after the limit fixed by the letter of the law for
reaching a final determination, and even after the time fixed
for commencement of the term of office.

Then, since there can be but one return unless the law is to
be regarded as impliedly changed in one of its most essential
features, the holding up of the finality for part of the offices
would hold it up as to all.

Then, there is the extraordinary scope of the law.   The
canvassing board is empowered to try any question of fraud
in the counting or return of the votes cast "and any other de-
fect, irregularity or illegality in the conduct of said primary
or election."   Did the legislature intend to clothe each county
canvassing board with full judicial powers, as the quoted lan-
guage, in the letter, would indicate ?   If not, and we must
take that aspect of the matter if reasonably possible,—since
the other view would condemn the law, in part at least, and
greatly endanger the whole as unconstitutional,—what is the
intended scope of the new power ?

Then, there is the right of appeal by any candidate, ag-

grieved by any decision in a recount proceeding.    While the determination might, by a sort of revolving course, contest tacking onto contest, lasting indefinitely, and, in the whole, be delayed a long time,—five days is allowed for taking an appeal by any candidate conceiving himself aggrieved; and then five days more for bringing the matter to a hearing before the circuit judge.    The contest is to be then summarily heard, but must, necessarily, wait upon the ability of the judge to immediately take up the matter,—in view of many interferences which might be suggested,—and the course of things in executing a reference which is provided for "upon any and all questions."    The probable end of such litigation no one would venture to suggest.    Did the legislature intend this, or if not, what is the reasonable solution of the matter?

By the letter of the act, it will be seen, the finality as to county officers, all of them—regardless of whether there is any doubt as to the result as to one or more,—and the finality as well as to state officers, must wait upon results of the appeal, because, pending the litigation, the court is required to have possession of "all the ballots, papers and records affecting such appeal."    Did the legislature intend such a state of things, and if not, what is the reasonable solution of that matter?

If it should be said this latter feature of the law is unconstitutional, or this and the one delegating the broad powers indicated to the canvassing board to try questions after the manner, substantially, of a *quo warranto* proceeding, is there reasonable ground under our rule 7, for holding the legislature would have favored the enactment without such features?

Again, was it intended that the special remedy, if resorted to, should be exclusive, or that after having run its course, that "any candidate may still resort to any other ordinary remedy," "affecting the trying of title to office?"    If it was not intended to create a new remedy for trying title to office, why did the legislature, *ex industria*, provide "nothing in this

section shall be construed to abrogate the right or remedy that any candidate may now have affecting the trial of title," etc. ? If such a remedy was in the legislative mind, was it intended that it should extend to offices in respect to which the title is a matter exclusively within the jurisdiction of other tribunals, such as the state assembly and senate, and the houses of Congress ?

Many other uncertainties might be pointed out. In the aggregate they make about as complicated and uncertain a situation as could be imagined. Just the scope of the pronouncement that should be made under the circumstances, is difficult to arrive at with any degree of unanimity. There is the view that the whole act is so involved in uncertainty that it should be declared incapable of execution and void on that account under the rule stated in the opening part of the opinion. For myself, I have no hesitation in saying that I incline to that method of thus entirely clearing the written law of the state of the perplexing enactment; but I hesitate in deference to a less radical course. Then there is the view, which is pretty satisfactory to the majority, at least, that the legislature either did not intend to disturb the existing law, or that its purpose, so far as it would prevent the county canvass and the state canvass from being concluded within the time prescribed in such law, is so involved in obscurity as not to be discoverable with such reasonable clearness as to form a legitimate basis for a judicial conclusion.

On the whole, it is considered that this latter view is as far as the court can go. That would result in there being a want of jurisdiction to continue recount proceedings after expiration of the time for making county returns to the secretary of state, or, in any event, the time limited for the state board to enter upon its work without capacity to adjourn, viz. the 10th day of December succeeding the election.

The latter limit was substantially reached when the cause was submitted, and wholly so when the decision was ren-

dered; and, it being practically conceded that the recount proceedings were then entirely inconclusive, and appearing that full performance of duty under sub. 1, sec. 87, could not wait upon the uncertainties of proceedings under the new section (sec. 86), it was considered that it was the duty of the county canvassing boards to speedily conclude their labors from the election district returns and make due report thereof under sub. 1, sec. 87, and for the state canvassing board to perform its duty under sec. 94e, acting upon said returns only; and that the duty of the latter board under sub. 2, sec. 94, and sub. 1 and 2, sec. 94a, Stats., is mandatory as regards any right to delay to accommodate proceedings under sec. 86,— though so far directory that jurisdiction continued for full performance after the time limited for delays by adjournments under sub. 1 and 2, sec. 94,—and that for omission of duty in respect to any of the situations mentioned, *mandamus* will lie to compel performance.

Thus it will be easily seen, the intention was, as was supposed to have been understandingly expressed, to decide that the time having gone by for further proceedings under sec. 86, so far as the court could see its way clear to give effect thereto, they should cease. The order was entered accordingly as indicated in the statement.

The further clearing up of uncertainty created by the law in question is thus left by the court for the legislature. It were better, it is considered, as said, in effect, in another jurisdiction quoted from in the opening part of this opinion, for the lawmaking power to do that, "than for the court to transcend the just limits of its jurisdiction." The court can go to the extent indicated without disturbing the integrity of the system which exists irrespective of the act of 1911. Restrained now to that extent it can do no hurt. The legislature may safely be intrusted to perform its duty as to the rest. In closing I am constrained to add, for myself again, that I think the court would be justified in declaring the act of 1911

wholly void for uncertainty, and that the co-ordinate branch of the government would be well satisfied with the assistance thus afforded it.

BARNES, J. (*dissenting*). Ch. 328, Laws of 1911 (sec. 86, Stats. 1913), is not a piece of legislation upon which its author can gaze with the satisfied and admiring eye that Micawber bestowed on his epistolary compositions. It is an act that appears to be thrown in a haphazard way among a lot of other provisions for which it has little affinity. It is a sort of a waif, an incongruity, a stranger in a strange land.

If it did not emerge *hors de combat* from its contact with this court, it carries as many battle scars as some of the unfortunate noncombatants in the present war. Its fangs, if it had any, have been extracted. It is now neither useful nor ornamental to any appreciable extent.

It would have been better had the legislature remodeled some other election statutes at the time it passed this one, to preserve at least the appearance of harmony if nothing more.

I fully realize that it is much easier to criticise laws after they are in working operation than it is to draft them when foresight is the only guide. Legislative prevision is at a disadvantage when pitted against judicial hindsight. But the responsibility for drafting statutes is placed with the legislature and must rest there. This court is not an upper house to work over legislative enactments and fashion them as the court imagines they would have been fashioned by the lawmaking power had it been confronted with the situation that confronts the court. The remedy, if there is any, is to cut down the quantity and improve the quality of our legislation. This may not be the right cure, but whatever the remedy may be, it rests with the legislature and not with the courts. If any authority for this proposition is needed, the reader is respectfully referred to Mr. Roe's book entitled "Our Judicial Oligarchy." The court feels at times that it could improve

on the legislation that comes before it. It is not improbable that the legislature at times feels that it could make better decisions than the court does. Possibly this feeling is not confined to the legislature. But each has its particular field of labor cut out for it by the constitution, and neither should encroach on the prerogatives of the other.

Briefly stated, the position of the court seems to be this: If the law means what it says, it is unconstitutional, or else too indefinite for enforcement; ergo, the legislature, while thinking one thing, inadvertently said something else. In other words, it miswrote its state of mind. It is too bad that our language is not more exact. I have sometimes noticed a lack of clarity even in judicial decisions made in other jurisdictions. After giving the court all due credit for judicial acumen and courage, I am unable to agree to the conclusion reached.

In construing a statute it is hardly fair to begin by conjuring up a lot of ghosts or by setting up straw men so as to indulge in the pleasure of knocking them down. When we let loose our imaginative powers, there is hardly any limit to the heights to which we may soar or to the depths to which we may descend. We can imagine that Roosevelt will insist that Taft is the logical candidate for President at the next election, or *vice versa;* or that the English Parliament will soon pass a vote of confidence in the Kaiser or in G. Bernard Shaw, or that the English and German governments will agree on who was responsible for starting the war, or that the present war will be the last one; or even that a constitutional government will be established in Mexico within the next half a century. But a statute should not be compelled to run the gauntlet of any such farfetched possibilities.

On its face, sec. 86 is a plain statute at least as far as it goes. It becomes doubtful and uncertain only when we start out by assuming that the legislature did not mean what it said and therefore furnished one more enigma for the citizen and

the courts to wrestle with. The statute provides that whenever any candidate is informed *and believes* that a *mistake* was made *or fraud* was committed in the *counting* or *return* of the votes cast in specified precincts, or that there was any other defect, irregularity, or illegality in the conduct of the election, he may file a *verified* petition with the county clerk setting forth the wrong which he believes has been done him. He must make a deposit of $2 for each precinct in which he finds fault with the result and serve notice on the opposing candidates, who have the right to be present while the county canvassing board proceeds to pass upon the matters complained of. A review of the decision reached may be had by appeal to the circuit court.

The scope of the section seems to have been greatly misapprehended in this case. It provides a summary method for correcting errors in the counting and return of votes and of dealing with fraudulent votes when the fraud is brought to the attention of the canvassing board by the petition asking for the recount. It neither provides for nor contemplates a trial after the manner of court procedure. It carefully excludes any such idea, by permitting the parties to be present in person and by counsel, to the end that they may *"observe the proceedings,"* not participate in them. There is no reason why the work cannot be carried to a conclusion speedily, or why any one should be deprived of the sacred right to hold office because of the law. The relief provided for will be sought only in cases where the vote is close. It is no benefit to the unsuccessful party to hold up the result of the election, and as an evidence of good faith he must deposit $2 for each precinct in which he desires a recount. To assume that all of the candidates who are apparently defeated will rush in to demand a recount is creating a bogeyman, and if they should do so it would not make any difference with the validity of this statute.

Now there ought not to be any doubt even in the minds of

judges as to the purpose of the statute here involved. It was passed to insure honesty in elections. It is more important that the result of an election be determined correctly than that it be decided quickly. A candidate who is not elected should not be placed in office because of errors made in his favor, much less as a result of deliberate fraud. The defeat of the will of the majority is subversive of our whole system of government. Anything that seeks to preserve the integrity of the ballot should be commended. It may not be very important whether Jones or Smith performs the duties of a certain office, but it is very important that Jones should not do so if Smith was in fact elected and is qualified. How purity in elections may best be preserved is for the legislature to decide. It must perforce adopt what it conceives to be the policy best calculated to produce this result. That a court or some other body thinks it could prescribe some more efficient method is of no consequence. When the duly constituted authority has spoken, its fiat is the law of the state, if no constitutional infirmities are found in the law.

There is no suggestion in sec. 86 that the boards of county canvassers must stop proceedings at the expiration of any particular time. On the contrary, such a board is specifically required to "further proceed to ascertain and determine the facts alleged in said petition and make correction accordingly and recount the ballots in every precinct so specified." It is a mere idle farce, a waste of energy, to require a canvassing board to act under the statute, if it cannot continue until it is through, and there is nothing in the law to indicate that any such thing was intended. The object of the statute was to provide a method of ascertaining a pure question of fact, not compel an administrative body to imitate the action attributed to the King of France's forty thousand men.

Now the heavens would not fall if someone about whose election there is a substantial doubt should fail to get into office on scheduled time. It may turn out that he does not belong there, and I am unable to see wherein fault should be

found with legislation which establishes an orderly and expeditious procedure to determine whether he does or not.

I concede that a proceeding under this statute involving a state officer may require the state canvassing board to adjourn more than ten days from the 1st of December. There are two perfectly good answers to the reasoning of the court on this point. One is that sub. 3, sec. 94a, is directory as to time (and I predict that the court will so hold if a case arises involving title to office where the board has for any cause adjourned for a longer time), and the other is that if there is a conflict, the statute enacted last in point of time should prevail.

It is said that the statute under consideration cannot be enforced as written, because it would violate sec. 1 of art. XIII of the constitution. The material part of this section provides that the political year for the state shall begin on the first Monday in January in each year, and that the general election shall be holden on the Tuesday next succeeding the first Monday in November. I do not see where or how the statute runs counter to this section of the constitution. If any provisions of the constitution are affected, it would appear to be those that prescribe the length of the term of office of members of the legislature and other constitutional state officers. If newly elected officers cannot qualify before their terms begin, it might be said that they were deprived of the right to hold their offices for the full term. These provisions do not mean, however, that contests over offices must be settled before the term begins or else they cannot be settled at all. Mr. Barstow's title to office was tried and determined after he received the certificate of election and took his seat, and he was ousted from the office of governor by this court. In the *Bashford-Barstow Case*, 4 Wis. 567, the court said very distinctly that it was the *election* and not the canvass of votes or the certificate of election that conferred the right to hold office. The machinery for determining the result of an election must, under the constitution, be provided by the leg-

State ex rel. Husting v. Board of State Canvassers, 159 Wis. 216.

islature, if any machinery is to exist different from that pre-
vailing at common law.  The legislature has the right to re-
peal any legislation which it enacts, save when vested rights
would be thereby destroyed.  It has the right to adopt all
suitable and proper means to preserve the integrity of elec-
tions, even to the extent of debarring the person elected from
taking office at the appointed time, where it is necessary to
do so in order to ascertain who in fact is entitled to the office.
It is not shown in the present case that the statute under con-
sideration would prevent the issuance of a certificate of elec-
tion before a term of office begins, and, if it were so shown,
the law would not be invalid for that reason.

I shall allude but briefly to Mrs. Pandora Epimotheus's
box of difficulties which the court has discovered.  They are
largely imaginary.  I see no difficulty in the way of deter-
mining and certifying the election of county officers in the
usual manner, where no recount is sought, even though a re-
count is asked as to a state officer.  I do not even see any
great difficulty in the way of certifying the returns as to
state officers where there is no contest and making a supple-
mental return as to those on which there is a contest after
such contest has been decided, and I am decidedly of the
view that the legislature has the right to confer on canvassing
boards each and every power and duty prescribed by sec. 86.
I further think that these duties can by the exercise of rea-
sonable diligence be performed so as to enable every patriot
to take his office at the appointed time.  If, however, it
should take a longer time to ascertain who is in fact entitled
to the office, such time may be taken without violating the
constitution.

WINSLOW, C. J.  I agree with the conclusions reached by
Mr. Justice BARNES.

TIMLIN, J., took no part.